## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VAUDRAL LUXAMA, CHANDLER LUXEUS, JAVIER R. GARCIA, FREDO BONHOMME, SANTOS MALDONADO, CHANEL FONTIN, *each individually and as class representatives*,<br><br>Plaintiffs,<br><br>v.<br><br>IRONBOUND EXPRESS, INC.,<br><br>*Defendant*. | Civil Action No. 11-2224 (JMV) (JBC)<br><br>**OPINON** |

### John Michael Vazquez, U.S.D.J.

This putative class action arises out of lease agreements between Plaintiffs[1] and Defendant Ironbound Express, Inc. ("Defendant" or "Ironbound"). Plaintiffs are "owner-operator" tractor-trailer drivers who lease their vehicles and driving services to Defendant. This matter began as a wage and hour claim but has since morphed into allegations that the lease agreements violated federal Truth-in-Leasing regulations, 49 C.F.R. § 376.1 *et seq.*, and for breach of contract. Plaintiffs seek class certification for owner-operator truck drivers who perform, or have performed, services for Defendant under identical leases. D.E. 118. Defendant does not assert that the leases complied with the regulations, but instead posits that the issue is moot because Defendant recently implemented a new lease form. D.E. 192.

---

[1] Plaintiffs consist of Vaudral Luxama, Chandler Luxeus, Javier R. Garcia, Fredo Bonhomme, Santos Maldonado, and Chanel Fontin (collectively "Plaintiffs").

Currently pending before the Court is Plaintiffs' second motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and/or (b)(3). D.E. 179. The motion was decided without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). The Court has considered the parties' submissions[2] and, for the reasons stated below, grants in part and denies in part Plaintiffs' motion.

## I. BACKGROUND[3]

Defendant is a New Jersey company involved in intermodal freight transportation, with two offices in Newark, New Jersey. TAC ¶ 12. Intermodal freight transportation refers to a system of transporting freight using standardized containers that can be mechanically loaded onto, and unloaded from, tractor-trailers. *Id.* ¶ 21. The standardized containers come in twenty-foot or forty-foot equivalent units. *Id.* ¶ 22.

Plaintiffs are "owner-operators" who own their tractors and lease, or have leased, their tractor and driving services to Defendant. TAC ¶ 6; Pl. Br. at 4. Defendant contracts with approximately one hundred drivers. *Id.* ¶ 23. From at least January 20, 2003 to September 22, 2009, Defendant entered into the same standard lease agreement (the "Lease") with each Plaintiff.[4] D.E. 179-5. The Lease is effective for ninety days and then renews for additional ninety-day periods unless either party gives the required written notice of termination. *Id.* at 2, ¶ 3.

---

[2] Plaintiffs' brief in support of their motion is referred to as "Pl. Br.," D.E. 182; Defendant's opposition is referred to as "Def. Opp'n," D.E. 192; Plaintiffs' reply is referred to as "Pl. Reply," D.E. 198; Defendant's supplemental letter of authority is referred to as "Def. Supp. Ltr.," D.E. 199; and Plaintiffs' response to the supplemental letter is referred to as "Pl. Supp. Resp.," D.E. 200.

[3] The facts are derived from Plaintiffs' Third Amended Complaint ("TAC"), D.E. 118; Defendant's Answer ("Ans."), D.E. 120; exhibits attached to Plaintiffs' brief in support of their motion, D.E. 179; and exhibits attached to Defendant's brief in opposition, D.E. 192.

[4] The Court cites to Luxama's March 23, 2009 Lease only, but all relevant portions of the Leases are identical. *See* D.E. 179-5.

Under each Lease, Plaintiffs lease their tractors (and potentially trailers) to Defendant "for use in the conduct of its business" and Plaintiffs agree to "furnish all labor and other services required . . . for the operation of that equipment." *Id.* at 2, ¶ 1. Plaintiffs are expressly designated as independent contractors. *Id.* at 3, ¶ 4. Defendant takes "exclusive possession, control and use" of the vehicle, and Plaintiffs are only to operate the truck "within the guidelines of origin and destination points and pickup and delivery times set by [Defendant] to conform with the requirements of [Defendant]'s customers." *Id.* In addition to quarterly maintenance reports, Plaintiffs are to submit documentation to Defendant upon completion of each trip. *Id.* at 4, ¶ 7. Although Defendant "does not guarantee [Plaintiffs] any minimum number of trips," "[i]t is understood and agreed between the parties that [Plaintiffs] shall be available for service at the option of and upon the demand of [Defendant]." *Id.* at 5, ¶ 14. Nonetheless, Plaintiffs have the "right to refuse to carry a particular load for [Defendant] at any time." *Id.* at 4, ¶ 11.

The Lease serves as the basis for this lawsuit. Plaintiffs allege that the Lease violates Truth-in-Leasing regulations, that the Leases were breached, or both, as to the following areas: (1) compensation, (2) deductions/charge backs, (3) escrow funds, (4) workers' compensation insurance, (6) fuel surcharges, and (7) parking-space rental requirements. Pl. Br. at 8-20. Each area is discussed in turn.

Under the Lease, Defendant agrees to compensate Plaintiffs on a "per-trip basis according to the terms of Schedule B," which is supposed to be "annexed" to the Lease. D.E. 179-5 at 2, ¶ 2. However, a Schedule B was not attached to any of the Leases. Pl. Br. at 9-10; Def. Opp'n at 4. Plaintiffs allege that in lieu of the missing schedules, at the time of entering into the Lease, Defendant orally promised to compensate Plaintiffs in an amount equal to seventy percent of Defendant's payment for each job (the "70/30 split"). FAC ¶ 26; Pl. Br. at 11. Plaintiffs support

this assertion by referencing Fontin's contract with another company, which had a seventy-percent compensation provision. Pl. Br. at 11. Plaintiffs allege that Defendant assured Fontin that he would be paid the same percentage if he switched to Defendant's company. *Id.*

Plaintiffs add that Defendant took affirmative steps to prevent Plaintiffs from calculating what their correct pay is. TAC ¶ 38; Pl. Br. at 13. Defendant at times provided Plaintiffs with a work order from the shipping company that retained Defendant's services for that trip. TAC ¶ 38; Pl. Br. at 13; D.E. 179-6. However, Defendant redacted the price that the shipping company paid Defendant for the trip. *Id.* Defendant redacted this information by "cutting out" the information or "using what appears to be White-out." Pl. Br. at 13; D.E. 179-6 at 2, 4. This practice typically prevented Plaintiffs from calculating what their pay should have been under the 70/30 split. Pl. Br. at 13. However, Plaintiff Bonhomme was once able to scrape the White-out off of one of his work orders, uncovering that he was only paid $90 for a trip in which he should have received over $1,000. TAC ¶ 77. Further, Plaintiff Bonhomme alleges that he once asked his supervisor to show him documents to confirm that he was paid 70% of what Defendant was being paid for a trip, and the supervisor responded, "[O]ver my dead body." TAC ¶ 68.

Defendant refutes any allegation of a 70/30 split, and instead alleges that "Schedule B" refers to "trip sheets" – separate contracts negotiated by the parties on a trip-by-trip basis specifying how much a driver will be paid for a specific trip. Ans. ¶ 26; Def. Opp'n at 4. The Leases, however, do not make any reference to the "trip sheets" comprising Schedule B. Defendant asserts that it provides drivers with an initial offer of "what they will be paid to move a container, its origin and destination points and the time to pick it up and deliver it." Def. Opp'n at 4.

According to Defendant, when determining the rate that it will offer for a particular trip, it

considers the following:

> (i) the distance to be traveled; (ii) volume of work to be completed; (iii) deadlines for completion; (iv) pick-up and drop-off locations (including whether those locations are congested); (v) whether the load is overweight; (vi) whether the load is hazardous or refrigerated; (vi) whether an empty move of a refrigerated container involves a "genset" (generator set); (vii) whether a move is an import or an export; (viii) whether the move is a single- or double-move; (ix) the total compensation offered by [Defendant]'s customer for the trip (including amounts of any fuel surcharge, toll reimbursement, or other payment); (x) whether a chassis owned by Ironbound or a leased chassis will be used; (xi) whether the shipping terminal reimburses any tolls directly to the driver for the particular route.

Def. Opp'n at 8. Drivers then have the option of accepting the rate, negotiating a different rate, or "balking" at the proposed rate. *Id.* Defendant cites to a number of "negotiations" that took place, as described by Plaintiffs, to support its claim that the parties use individually negotiated trip sheets, not a 70/30 split system. *Id.* at 9-12. The numerous factors cited by Defendant are also not referenced in the Lease as to Schedule B. Instead the Lease states that the Defendant "agrees to pay [Driver] according to the terms of Schedule B annexed hereto. Payment shall be made on a per-trip basis according to the terms of Schedule B." D.E. 179-5. at 2, ¶ 2.

For their part, Plaintiffs do not appear to contest that the trip-by-trip negotiation was Defendant's actual practice. All Plaintiffs, except for Luxama, testified to having negotiated rates on a trip-by-trip basis. Def. Opp'n at 9-13. Plaintiff Bonhomme agreed that he was "paid on a per-trip basis" and that he "negotiated the price of those trips prior to making the trip." D.E. 192-1 at 40, ¶¶ 17-22. Plaintiff Fontin testified that "on a regular basis," he "negotiated with [Defendant] over rates" for trips, but that Defendant "never change[d] [its offer]." *Id.* at 56, ¶¶ 4-6. Plaintiff Garcia stated that he negotiated rates with Defendant "all the time" and that he "usually was" successful in negotiating a better rate than originally offered. *Id.* at 76-77, ¶¶ 16- 25, 1-5.

Plaintiff Maldonado similarly testified that drivers could "negotiate higher rates" on a "per trip basis," and that at one point in time they "always gave [him] extra money" when he negotiated the rate. *Id.* at 127-128, ¶¶ 8-19, 18-24. Plaintiff Luxeus also indicated that drivers "have to negotiate the trip," and agreed that "sometimes [he] would negotiate the price up." *Id.* at 105, ¶¶ 21-24; *Id.* at 146, ¶¶ 11-13. Therefore, other than Luxama, it does not appear that Plaintiffs contest that the trip sheet system was actually used, only that this system of compensation is contrary to the parties' agreements at the formation of their Lease contracts.

The Lease also provides that Defendant may deduct certain expenses from the drivers' compensation, stating:

> [Driver] agrees that [Defendant] shall have the right to charge against any settlement owed [Defendant] under this Lease amounts sufficient to reimburse [Defendant] for the following items of expense which [Defendant] may incur by or on behalf of [driver] or by reason of [driver]'s performance hereunder: (a) any tax or cost of operating or maintaining the leased equipment . . . (b) any fines or penalties imposed upon [Defendant] as a result of violations by [driver] . . . (c) any losses or expenses incurred by [Defendant] as a result of the failure of [driver] . . . to remit to [Defendant] any monies collected on behalf of [Defendant] . . . (d) any losses or expenses incurred by [Defendant] as a result of its inability to collect freight charges earned due to [Defendant]'s failure to properly complete and submit the paperwork and documents . . . [and] (e) any loss of or damage to property or cargo or any other losses or expenses which [Defendant] may incur or for which it may be held liable as a result of [driver]'s conduct hereafter.

D.E. 179-5 at 7, ¶ 20. With regards to the damage deductions in part (e), the Lease also states that "[p]rior to effecting any withholding against [driver] for such losses, expenses or liabilities, [Defendant] shall provide [driver] with a written explanation and itemization of the withholding to be made." *Id.*

Plaintiffs assert that "[a]lthough the Lease includes the foregoing list of the charge-back items that [Defendant] may deduct from a [d]river's pay, [Defendant] does not specify the manner

6

by which the amount of each charge back is computed." Pl. Br. at 15-16. For example, Plaintiffs allege numerous deductions from their paychecks for "damage" without any further written explanation or itemization of these claims. TAC ¶ 96. Plaintiff Bonhomme had a $400 deduction taken without explanation or itemization and when he asked about it, he was only told, "oh, you broke a chassis or a tire." *Id.* Plaintiff Fontin witnessed a $760 deduction from his paycheck without any explanation. *Id.* Plaintiff Garcia noticed a $2,500 deduction from his paycheck after a motor vehicle accident, but was never reimbursed after the other driver was determined to be at fault. *Id.* Plaintiffs Luxama and Luxeus also allege numerous unexplained deductions from their pay. *Id.*

Plaintiffs note that Ironbound also uses an escrow account entitled the "Driver Deposit Fund." Pl. Br. at 6, n. 5. The Lease mandates the maintenance of the "Driver Deposit Fund," whereby Defendant "shall maintain an escrow fund throughout the term of this Lease to be used for the adjustment of claims between the parties to this Lease." D.E. 179-5 at 6, ¶ 18. Under the Lease, Plaintiffs agreed "to pay the sum of $1000.00 into the fund and to replenish the fund as necessary throughout the term of this Lease to maintain it at a minimum level of $1000.00 at all times."[5] *Id.* The Lease further provides that Defendant

> may charge the escrow fund the actual amount up to $1000.00 for any and each of the following losses occasioned by the [driver]'s negligence or maintenance: (1) loss of freight charges, (2) damage to cargo, (3) damage to property by the [driver], (4) damage to other property for which the [Defendant] may be held liable, and (5) uprighting and towing. In the event such losses exceed $10.00 or the monies available in the escrow fund, [Defendant] may withhold from any settlements due the [driver] sufficient sums to cover its expenditures, losses, or liabilities in connection with such losses. Whenever such a charge or withholding is being made, the [Defendant] will provide the [driver] with a written explanation

---

[5] Plaintiffs note that sometime after April 19, 2005, Ironbound revised this section of the lease to increase the deposit from $600.00 to $1000.00. Pl. Br. at 6.

therefore.

*Id.* The Lease continues that Defendant "agrees to provide the [driver] upon reasonable request, with a summary written accounting of any and all transactions involving the escrow fund," indicating "the amount and description of any deductions." *Id.* Plaintiffs allege that Defendant improperly takes deductions from the Driver Deposit Fund without explanation or accounting. TAC ¶ 85.

Regarding workers' compensation insurance, the Lease states as follows:

> [Driver] agrees to procure and pay the full expense of . . . Worker's Compensation insurance. . . . In the event [driver] is unable to obtain suitable Worker's Compensation insurance, [driver] hereby authorizes [Defendant] to procure and pay for such insurance as [driver]'s agent, and to charge back the cost of such insurance against any settlements due [driver] hereunder at a rate and on a schedule to be agreed upon between [Defendant] and [driver]. [Defendant] shall provide [driver] with a Certificate of Insurance for any policy of Worker's Compensation insurance which it may purchase on [driver]'s behalf which shall specify the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, and the deductible amounts for which [driver] may be liable under each type of coverage. Upon request, [Defendant] shall supply [driver] with a copy of any such policy which it may purchase on [driver]'s behalf.

D.E. 179-5 at 6, ¶ 17.

Plaintiffs allege that Defendant "improperly charges the drivers more than [Defendant] pays for the Workers' Compensation coverage." TAC ¶ 35. Among other things, Plaintiffs assert that Defendant charged Plaintiffs a fixed percentage, 5% of Plaintiffs' compensation for a particular job, for the insurance regardless of how much Plaintiffs were actually being paid for the job. *Id.* ¶ 83. Plaintiffs also indicate that they were never informed of the amount of workers' compensation coverage they had or provided with any of the other required information. *Id.* ¶ 84.

By the terms of the Lease, Plaintiffs agree to pay the entire cost of operating and

maintaining the tractor, including fuel, lubrication, maintenance, repair, tolls, highway use taxes, traffic fines, and license plate costs. *Id.* at 3. Defendant, however, sometimes collects fuel surcharges from shipping companies. TAC ¶ 36, Ans. ¶ 36. Plaintiffs allege that Defendant "improperly retains those surcharges despite the drivers incurring the cost of fuel as per their Leases[.]" TAC ¶ 36; Pl. Br. at 20. Defendant responds that it "sometimes agrees to pay a driver more based on a fuel surcharge," and these agreements are individually negotiated. Ans. ¶ 36; Def. Opp'n at 15.

The Leases provide that that Plaintiffs are "not required to purchase or rent any products, equipment, or services from [Defendant] as a condition of entering into this Lease." D.E. 179-5 at 4, ¶ 15. Plaintiffs allege that prior to filing this suit, Luxama, Fontin, and Bonhomme were nevertheless required to rent parking spaces from Defendant for their tractors as a condition of the Lease, at a price between $100 to $150 per month. Pl. Br. at 17-18. This practice ended upon the filing of this lawsuit. *Id.*

## II. PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint on April 19, 2011, alleging claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and New Jersey's Wage and Hour Law ("NJWHL"), N.J.S.A. 34:11-4.4 *et seq.* D.E. 1. One hundred and eighty-eight (188) drivers opted into the case with respect to the FLSA claim. D.E. 3-8, 17, 21-22, 26, 29, 36, 40, 42, 45, 50, 51, 53, 55-61, 76, 78. Defendant moved to dismiss Plaintiffs' Complaint on June 30, 2011. D.E. 19. On October 20, 2011, Plaintiffs filed their first motion for class certification on the FLSA claim. D.E. 46. On June 28, 2012, Judge Salas granted Defendant's motion to dismiss Plaintiffs' Complaint without prejudice, finding that Plaintiffs failed to allege sufficient facts supporting the assertion that they are "employees" of Defendant, which is required for their FLSA claim. D.E.

77, 78. The determination mooted Plaintiffs' first motion for class certification. *Id.*

Plaintiffs filed their First Amended Complaint ("FAC") on July 30, 2012, again alleging that they are "employees" of Defendant for purposes of the FLSA, and this time adding a claim for violations of federal Truth-in-Leasing regulations, 49 C.F.R. § 376.1 *et seq.* D.E. 79. Defendant again moved to dismiss. D.E. 81. On June 27, 2013, Judge Salas dismissed Plaintiffs' FLSA claim without prejudice, again finding that Plaintiffs pled insufficient facts to support that they are "employees" of Defendant, and dismissed without prejudice Plaintiffs' Truth-in-Leasing claims, finding that Plaintiffs' had not sufficiently alleged any injury-in-fact stemming from the alleged violations of these regulations. D.E. 97, 98.

Plaintiffs filed their Second Amended Complaint ("SAC") on July 26, 2013, alleging the same claims for relief. D.E. 100. Defendant again moved to dismiss, positing largely the same arguments as in its previous two motions. D.E. 106. On July 30, 2014, Judge Salas heard oral argument on the motion. D.E. 112. The next day, the parties entered into a stipulation whereby Plaintiffs withdrew all of their counts except two FLSA claims, a breach of contract claim, and Truth-in-Leasing claims. D.E. 113. Judge Salas then dismissed Plaintiffs FLSA claims with prejudice and Plaintiffs' breach of contract and Truth-in-Leasing claims without prejudice. D.E. 115.

Plaintiffs followed with their Third Amended Complaint ("TAC"), alleging (1) violations of the Truth-in-Leasing regulations, seeking declaratory and injunctive relief under 49 U.S.C. § 14704(a)(1), monetary damages under § 14704(a)(2), and attorneys' fees under § 14704(e); as well as (2) breach of contract. D.E. 118. On January 31, 2018, both Plaintiffs and Defendant moved for partial summary judgment, D.E. 177, 178, which were later terminated, D.E. 196. On the same day, Plaintiffs also filed the current motion for class certification, D.E. 179 (amending their brief

in support of this motion on February 14, 2018, D.E. 182). Defendant opposed Plaintiffs' motion, D.E. 189, and Plaintiffs replied, D.E. 198.

## III. LEGAL STANDARDS

### A. Truth-in-Leasing and Breach of Contract

As to the underlying law, Plaintiffs allege (1) five violations of federal Truth-in-Leasing regulations, 49 C.F.R. § 376 *et seq.*, and (2) breach of contract. TAC ¶¶ 50-99. The federal Truth-in-Leasing regulations, 49 C.F.R. § 376.1 *et seq.*, were promulgated under the Motor Carrier Act, 49 U.S.C. § 1401 *et seq.* Under the act, "Congress regulates leases between independent truckers and federally regulated motor carriers." *Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1211 (10th Cir. 2016). "Congress has tasked the Department of Transportation ("DOT") with further regulating these leases" and "the DOT does so through its Federal Motor Carrier Safety Administration and its [T]ruth-in-[L]easing regulations, 49 C.F.R. [§] 376." *Id.* (citing *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co.*, 632 F.3d 1111, 1113 (9th Cir. 2011)).

The purpose of the Truth-in-Leasing regulations is to "protect independent truckers from motor carriers' abusive leasing practices." *Id.* (citing *Owner-Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank*, 636 F.3d 781, 795 (6th Cir. 2011)). Thus, the regulations seek

> to promote truth-in-leasing—a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; . . . to eliminate or reduce opportunities for skimming and other illegal or inequitable practices by motor carriers; and . . . to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry.

*Id.* (citing *Comerica Bank*, 636 F.3d at 795). The regulations achieve this goal by "requiring, among other things, that the leases be in writing and specify their duration and the compensation that the carrier will pay the trucker." *Id.* The Motor Carrier Act also provides for a private right

11

of action for enforcement of the regulations, including declaratory and injunctive relief under 49

U.S.C. § 14704(a)(1), monetary damages under § 14704(a)(2), and attorneys' fees under §

14704(e). *Owner-Operator Indep. Drivers Assoc., Inc. v. C.R. England, Inc.*, 508 F. Supp. 2d 972,

983-84 (D. Utah 2007).

Section 376.12(a) of the regulations states that "[t]he lease shall be made between the

authorized carrier and the owner of the equipment." 49 C.F.R. § 376.12(a). Section 376.12(d)

requires the authorized carrier to specify in the lease the amount it will compensate the owner,

providing as follows:

> Compensation to be specified. The amount to be paid by the
> authorized carrier for equipment and driver's services shall be
> clearly stated on the face of the lease or in an addendum which is
> attached to the lease. Such lease or addendum shall be delivered to
> the lessor prior to the commencement of any trip in the service of
> the authorized carrier. An authorized representative of the lessor
> may accept these documents. The amount to be paid may be
> expressed as a percentage of gross revenue, a flat rate per mile, a
> variable rate depending on the direction traveled or the type of
> commodity transported, or by any other method of compensation
> mutually agreed upon by the parties to the lease. The compensation
> stated on the lease or in the attached addendum may apply to
> equipment and driver's services either separately or as a combined
> amount.

49 C.F.R. § 376.12(d). Plaintiffs allege that Defendant violated this provision because the Lease

refers to a "Schedule B" to govern compensation, but Defendant does not attach a Schedule B to

the Lease – meaning compensation is not clearly stated on the face of the Lease or in an attached

addendum. TAC ¶ 67.

Section 376.12(g) requires the authorized carrier to also provide sufficient documentation

to support this compensation, stating:

> Copies of freight bill or other form of freight documentation. When
> a lessor's revenue is based on a percentage of the gross revenue for
> a shipment, the lease must specify that the authorized carrier will

> give the lessor, before or at the time of settlement, a copy of the rated freight bill, or, in the case of contract carriers, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. Regardless of the method of compensation, the lease must permit lessor to examine copies of the carrier's tariff or, in the case of contract carriers, other documents from which rates and charges are computed, provided that where rates and charges are computed from a contract of a contract carrier, only those portions of the contract containing the same information that would appear on a rated freight bill need be disclosed. The authorized carrier may delete the names of shippers and consignees shown on the freight bill or other form of documentation.

§ 376.12(g). Plaintiffs allege that Defendant either refuses to allow them to examine documents setting forth rates and charges paid by the shipping company or, when Defendant allows Plaintiffs to view the documents, the rates and charges are redacted. TAC ¶ 75.

Section 376.12(h) specifies requirements for charge-back items, stating the following:

> Charge-back items. The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge.

49 C.F.R. § 376.12(h). Additionally, regarding deductions for damages, Section 376.12(j)(3) states that the "lease shall clearly specify the conditions under which deductions for cargo or property damage may be made from the lessor's settlements" and "shall further specify that the authorized carrier must provide the lessor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to the lessor." § 376.12(j)(3). "The written explanation and itemization must be delivered to the lessor before any deductions are made." *Id.*

Plaintiffs allege that although the Lease lists a number of permissible charge-back items,

the Lease fails to recite any manner in which these amounts are to be computed. TAC ¶ 82. Plaintiffs also allege that Defendant does not provide supporting documentation or written explanation for charges it deducts from Plaintiffs' paychecks and escrow accounts for property damage. *Id.* ¶¶ 85, 95. It also appears that the workers' compensation paid for by Defendant and charged to Plaintiffs falls under Section 376.12(h), which requires Defendant to provide Plaintiffs with the relevant documents so that Plaintiffs can confirm the validity of the charge.[6] As noted, Plaintiffs claim that Defendant does not provide the required information. TAC ¶ 84. Plaintiffs add that Defendant apparently overcharges them for the insurance as well. *Id.*

Section 376.12(i) provides that a "lease shall specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement." § 376.12(i). While the Lease contains the required language,[7] Plaintiffs contend that they were in fact required to rent parking spaces from Defendant. TAC ¶¶ 90, 91.

Finally, Section 376.12(k) prescribes requirements regarding escrow funds, whereby if escrow funds are required under the lease, the lease shall specify (among other things): "[t]he amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party," "[t]he specific items to which the escrow fund can be applied," and "[t]hat while the escrow fund is under the control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of any transactions involving such fund." § 376.12(k)(1)-(3). The Section also states that the authorized carrier should perform the accounting by "clearly

---

[6] 49 C.F.R. § 376.12(j) also addresses insurance but it does not appear to apply to workers' compensation insurance. Instead, the provision addresses insurance coverage protection of the public pursuant to certain regulations and coverage for the operation of the leased equipment. *Id.*

[7] Plaintiffs argue that this provision was not in fact in the Lease, but Lease clearly contains it.

indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund," or "providing a separate accounting to the lessor of any transactions involving the escrow fund." § 376.12(3)(i)-(ii). Further, "[t]his separate accounting shall be done on a monthly basis." § 376.12(3)(ii). Plaintiffs argue that Defendant takes deductions from their escrow accounts without any explanation or accounting. TAC ¶ 85.

Plaintiffs also assert claims for breach of contract. To prevail on a breach of contract claim under New Jersey law,[8] a plaintiff must demonstrate the existence of a valid contract, failure of the defendant to perform its obligations under the agreement, the plaintiff's own compliance with the contract, and that the plaintiff suffered damages as a result of the breach. *Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013) (citing *Coyle v. Englander's*, 199 N.J. Super. 212, 223 (App. Div. 1985)). Plaintiffs base their breach of contract claims in Defendant's alleged failures (1) "to pay [Plaintiffs] amounts equal to seventy percent (70%) of the monies paid to Ironbound by the shipping companies," (2) "to pay Plaintiffs for detention time in excess of two hours," (3) "to pay the drivers fuel surcharges that Ironbound has collected from shipping companies which it promised to pass along to drivers," (4) to properly "set off or take[] deductions from the [Plaintiffs'] payments"; and (5) to honor the Lease's provision indicating that Plaintiffs were not required to rent the parking spaces from Defendant. TAC ¶ 54.

### B. Rule 23

Federal Rule of Civil Procedure 23 governs class actions. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). "[E]very putative class action must satisfy the four requirements

---

[8] The Lease states that "this Lease, and all of the terms and conditions contained herein, will be interpreted according to the laws of the State in which the Lease is executed." D.E. 179-5 at 8, ¶ 27. All of Plaintiffs' Leases were executed in New Jersey. D.E. 179-5 at 9, 18, 29, 38, 48, 58.

of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Id.* at 590 (citing Fed. R. Civ. P. 23(a)-(b)). Plaintiffs first bear the burden of showing that the proposed class satisfies the four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) There are questions of law or fact common to the class;
> (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). These four prongs are often referred to as numerosity, commonality, typicality, and adequacy. *See e.g., Erie Ins. Exch. v. Erie Indem. Co.*, 722 F.3d 154, 165 (3d Cir. 2013).

Plaintiffs also must show that proposed class satisfies Rule 23(b)(1), (b)(2), or (b)(3). *Marcus*, 687 F.3d at 590. Under Rule 23(b)(1), plaintiffs must prove that

> prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Fed. R. Civ. P. 23(b)(1).

Under Rule 23(b)(2), plaintiffs must prove that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). Finally, under Rule 23(b)(3) plaintiffs must prove that:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Pursuant to Rule 23(c)(1)(A), a court "must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). The decision to certify a class or classes is left to the discretion of the court. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008), *as amended* (Jan. 16, 2009). "The requirements set out in Rule 23 are not mere pleading rules." *Marcus*, 687 F.3d at 591 (citing *In re Hydrogen Peroxide*, 552 F.3d at 316). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Id.* (citing *In re Hydrogen*, 552 F.3d at 307). "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." *In re Hydrogen*, 552 F.3d at 318.

The Third Circuit emphasizes that "actual, not presumed, conformance with Rule 23 requirements is essential." *Marcus*, 687 F.3d at 591 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)) (internal quotations omitted). "To determine whether there is actual conformance with Rule 23, a district court must conduct a 'rigorous analysis' of the evidence and arguments put forth." *Id.* (quoting *Falcon*, 457 U.S. at 161). This "rigorous analysis" requires a district court to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Id.* Therefore, a district court "may delve beyond the pleadings to determine whether the requirements for class certification are satisfied." *In re Hydrogen*, 552 F.3d at 320.

## IV. ANALYSIS

Plaintiffs seek certification of a class comprised of owners and lessors who at any time since April 20, 2007, executed the Lease, or a lease that contained substantially similar language, and performed transportation services for Defendant. Pl. Br. at 6.

### A. Rule 23(a) Requirements

Defendant only challenges 23(a) requirements as to commonality and typicality. Def. Opp'n at 24-2. As a result, the Court only briefly reviews the numerosity and adequacy prerequisites before turning to the points of contention.

As to numerosity, "[n]o single magic number exists" to meet the requirement. *Summerfield v. Equifax Info. Servs. LLC*, 264 F.R.D. 133, 139 (D.N.J. 2009). Yet, "the Third Circuit has previously held that the numerosity requirement will generally be satisfied 'if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40.'" *Id.* (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)). Here, Defendant has confirmed that it employed as many as 200 drivers in or around 2006, and that it currently employs around 80 drivers. *Id.* All, or the vast majority, of the drivers were parties to the Lease. Thus, numerosity is met.

In reviewing the adequacy element, a court must decide whether the class representative "has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Sapir v. Averback*, No. 14-07331, 2015 WL 858283, at *3 (D.N.J. Feb. 26, 2015) (citing *Falcon*, 457 U.S. at 157 n. 13). "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). Adequacy functions as

a "catch-all requirement" that "tend[s] to merge with the commonality and typicality criteria of Rule 23(a)." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "Whether a party adequately represents a class depends on all the circumstances of the particular case." *Wetzel*, 508 F.2d 247. Moreover, the fact that a lead plaintiff is no longer employed by defendant-employer does not necessarily make that plaintiff's interests antagonistic to those of the present employees. *Id.* In fact, the Third Circuit has recognized that those former employees may be "better situated" to present an "intelligent and strongly adverse case" because they are "familiar with [defendant's] employment practices and . . . free from any possible coercive influence of [defendant's] management." *Id.*

Here, adequacy is met. Plaintiffs' counsel is more than adequate to represent the class as they are experienced in class action litigation and other complex litigation. Additionally, the named Plaintiffs' interests are not antagonistic of the rest of the class members. The fact that a majority of the named Plaintiffs are former employees of Defendant does not mean that they will inadequately represent current employees who are also members of the class. Defendant has not advanced any arguments to the contrary.

Turning to commonality, Defendant argues that Plaintiffs cannot meet the requirement because each class member would be entitled to an individualized award of monetary damages. Def. Opp'n at 24 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360-61 (2011)). The Court first notes that the section of the *Dukes* opinion on which Defendant relies addressed Rule 23(b)(2), not Rule 23(a)(2). *See Dukes*, 564 U.S. at 360-61 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class . . . it does not authorize class certification when each class member would be entitled to an individualized

award of monetary damages."). Moreover, although *Dukes* Court also found commonality lacking, *id.* at 359, such a conclusion is not warranted here.

"Rule 23(a)(2) requires Plaintiffs to demonstrate that 'there are questions of law or fact common to the class.'" *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 487 (3d Cir. 2018). Rule 23(a)(2)'s commonality requirement is a far less demanding standard than Rule 23(b)(3)'s predominance requirement. *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018), *as amended* (Apr. 4, 2018). However, Rule 23(a)(2)'s "language is easy to misread, since any competently crafted class complaint literally raises common questions." *Mielo*, 897 F.3d at 487 (citing *Dukes*, 564 U.S. at 349 (2011)) (internal quotations omitted). "A complaint's mere recital of questions that happen to be shared by class members is not sufficient"; instead, "commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* (citing *Dukes*, 564 U.S. at 349-50) (internal quotations omitted). "What matters . . . is not the raising of common 'questions' . . . but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. In other words, plaintiffs' claims "must depend upon a common contention" whereby "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

In *Dukes*, the potential class consisted of over one million current and former female Wal-Mart employees. *Id.* at 343. The plaintiffs alleged that "local [Wal-Mart] managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees" in violation of Title VII. *Id.* at 344. Wal-Mart, a retail juggernaut, was comprised of seven nation-wide divisions which were made up of 41 regions; each region had 80 to 85 stores. *Id.* at 342. Wal-Mart also had a corporate policy against sex discrimination. *Id.* at 353. Wal-Mart, however, generally committed pay and promotion decisions

to the discretion of local managers, who exercised their discretion in a predominately subjective manner. *Id.* at 343. To support their disparate impact claims, the plaintiffs relied on statistical evidence, anecdotal proofs, and expert sociological testimony. *Id.* at 346.

The majority of the Supreme Court found that commonality under Rule 23(a) had not been met. *Id.* at 359. The *Dukes* Court observed that the plaintiffs' claims "must depend on a common contention," such as discriminatory conduct by the same supervisor, which "is capable of classwide resolution" by way of a common answer to the claims. *Id.* at 350. Justice Scalia continued that the plaintiffs "wish to sue about literally millions of employment decisions at once" but lacked the necessary "glue" which would connect the reasons for those decisions. *Id.* at 352. Wal-Mart, the Court in *Dukes* noted, did not have a company-wide testing method that plaintiffs could allege to be biased and it had a general policy against gender discrimination. *Id.* at 353-55.

Turning to the plaintiffs' evidence, the Supreme Court noted that their expert could not determine with requisite specificity how often gender stereotypes played "a meaningful role in employment decisions at Wal-Mart." *Id.* at 354. To the contrary, the *Dukes* Court continued, Wal-Mart's delegation of discretion to local managers cut against the finding of a uniform policy. *Id.* at 355-56. The Court explained that as a result, "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." *Id.* Justice Scalia added that the statistical evidence also fell short because, among other things, disparities at the national (or even regional) level did not prove disparities in individual stores. *Id.* at 356-57. Finally, the majority rejected the anecdotal evidence as insufficient to establish commonality because it only represented 1 out of every 12,500 class members and only related to 235 out of 3,400 total stores. *Id.* at 358. Therefore, the *Dukes* Court held that "[b]ecause respondents provide no convincing proof of a companywide discriminatory pay and promotion policy, . . . they have

not established the existence of any common question." *Id.* at 359.

The current matter is far different from *Dukes*. First, Defendant's leasing policy and leasing forms are derived from a central source. Moreover, Plaintiffs' common claims – whether the Lease was breached and/or violated the Truth-in-Leasing regulations – are subject to common answers. Defendant does not have numerous locations in which different lease are or were used. Unlike in *Dukes*, the validity of Plaintiff's assertions as to the Truth-in-Leasing violations can be determined in one stroke because demonstrating the invalidly (or validity) of a provision in one Lease will necessarily demonstrate the invalidity (or validity) of that provision in all Leases, as the relevant portions of these Leases are all identical. *Id.* at 28-29. The same is true for determining whether Defendant breached provisions of the Lease regarding compensation, fuel charges, charge backs, escrow deductions, parking space rentals, and worker's compensation deductions. The Court does not have to analyze the discretionary decisions of potentially hundreds of different managers in order to determine if a class-wide violation exists – only the validity of a single contract under definite regulations and consistent, established practices by the company. Thus, *Dukes* is inapposite and does not countenance against a finding of commonality here.

Defendant also cites to *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312 (D.N.M. 2015). In *Anderson*, the plaintiff landowners leased their land to the defendant oil companies in exchange for a percentage of any proceeds the oil recovered. *Id.* at 353. The plaintiffs sued the defendants for, among other things, underpayment of royalties under the leases. *Id.* The relevant portions of the leases, however, were different. *Id.* at 439. Therefore, the *Anderson* court held that the primary common question – "how were the class members entitled to be paid by the [d]efendants[?]" – did not produce a common answer as required by *Dukes*. *Id.* at 438-40. The court in *Anderson* continued that no common question "on its own, definitively

establishe[d] a claim, even if answered in the affirmative." *Id.* at 439. Thus, the court denied class certification on commonality grounds. *Anderson* is not binding precedent on this Court. Moreover, unlike in *Anderson*, the relevant portions of the Lease are identical in this case. Plaintiffs have established commonality in this matter.

As to typicality, Defendant primarily argues that because Plaintiffs individually negotiated their rates, Plaintiffs' claims are atypical of each other, as Plaintiffs cannot point to a "common practice" that Defendant adhered to in these negotiations. Def. Opp'n at 28-29. "[T]ypicality demands that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Newton*, 259 F.3d at 182 (quoting Fed. R. Civ. P. 23(a)(3)). In other words, the lead plaintiff's claims must be "comparably central" to the claims of the absent parties. *Id.* at 183. This ensures that "the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'" *Id.* at 182-83 (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998)). Hence, the typicality requirement is "intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Id.* at 183.

However, all plaintiffs are not required to share identical factual circumstances. *Id.* at 183. Instead, a named plaintiff's individual circumstances cannot be "markedly different" from the other class members. *Id.* "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Id.* at 183-84. For example, "a claim framed as a violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice." *Id.* at 184 (citing *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994)). The Third Circuit has reasoned as follows:

> [T]he [typicality] requirement does not mandate that all putative class members share identical claims, because even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct.

*Id.* (internal citations and quotations omitted).

Here, typicality is met. The claims of the named Plaintiffs are typical of the claims of all potential class members. Plaintiffs seek to remedy (1) violations of Truth-in-Leasing regulations, and (2) breaches of the Lease. Even if there are factual differences about the damage that the improper Lease provisions or breaches of contract may have caused different Plaintiffs, such factual differences do not defeat typicality. The claims of the named Plaintiffs and putative class members all involve the same alleged conduct by Defendant: violations of federal regulations in the Lease and breaches of the Lease.

For the foregoing reasons, the Court concludes that the Rule 23(a) requirements are met in this matter. The Court now turns its Rule 23(b) analysis. Plaintiffs seek certification under (b)(1), (b)(2), and (b)(3) grounds. Each will be reviewed in turn.

## B. Proposed Rule 23(b)(1) Class

"Rule 23(b)(1)(A) permits certification if 'prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.'" *Premier Health Ctr., P.C. v. UnitedHealth Grp.*, 292 F.R.D. 204, 227 (D.N.J. 2013) (quoting Fed. R. Civ. P. 23(b)(1)(A)). Rule 23(b)(1)(A) is used to certify a class where the defendant is "obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Id.* (citing

*Amchem*, 521 U.S. at 614). Plaintiffs have not shown that a (b)(1)(A) class is appropriate. They have failed to demonstrate that any court has certified such a class in circumstances akin to the present matter. In fact, in support of their argument, Plaintiffs make an argument concerning declaratory judgment, Pl. Br. at 33, which is addressed in (b)(2) not (b)(1)(A). The Court denies certification of a (b)(1)(A) class with prejudice.

A class should be certified under Rule 23(b)(1)(B) when

> prosecuting separate actions by or against individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 604 (3d Cir. 2009) (quoting Fed. R. Civ. P. 23(b)(1)(B)). This type of class action is commonly applied in a "limited fund" case, where "numerous persons make claims against a fund insufficient to satisfy all claims." *Amchem*, 521 U.S. at 614. Here, Plaintiffs have not established that there is a "limited fund" incapable of satisfying all class members' claims, nor have they established that Rule 23(b)(1)(B) otherwise applies. Therefore, the Court denies certification under Rule 23(b)(1)(B) with prejudice.

### C. Proposed Rule 23(b)(2) Class

Rule 23(b)(2) allows for class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Dukes*, 564 U.S. at 360. "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 262 (3d Cir. 2011) (quoting *Dukes*, 564 U.S. at 360). Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory

judgment . . . [or] when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360-61 (emphasis in original). However, monetary relief that is "incidental" to the injunctive or declaratory relief may be appropriate under this rule. *Gates*, 655 F.3d at 262 (citing *Dukes*, 564 U.S. at 360).

"Although Rule 23(b)(2) classes need not meet the additional predominance and superiority requirements of Rule 23(b)(3), it is well established that the class claims must be cohesive." *Gates*, 655 F.3d at 263-64 (internal quotations omitted). The key to this cohesiveness requirement is "the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* at 264 (quoting *Dukes*, 564 U.S. at 360). Because all class members will be bound by a single judgment under Rule 23(b)(2), "a (b)(2) class may require more cohesiveness than a (b)(3) class." *Id.* at 264. If a court finds that the class meets the requirements of Rule 23(b)(2) but not Rule 23(b)(3), the court may certify the class as to Rule 23(b)(2) only. *E.g., Hurt v. Philadelphia Hous. Auth.*, 151 F.R.D. 555, 561 (E.D. Pa. 1993) (certifying a Rule 23(b)(2) class for declaratory and injunctive relief only).

Plaintiffs seek declaratory and injunctive relief under 49 U.S.C. § 14704(a)(1) for violations of federal Truth-in-Leasing regulations, 49 C.F.R. § 376.12(a)-(m). TAC ¶ 2. Section 14704(a)(1) authorizes a private citizen to "bring a civil action for injunctive relief for violations" of the regulations. Plaintiffs argue that the Lease violates the regulations in numerous ways. Pl. Br. at 28. All relevant portions of the Lease are identical for each Plaintiff and putative class member who entered into a Lease with Defendant prior to January 2018, when Defendant stopped using the standard Lease form at issue. Def. Opp'n at 2. Therefore, Plaintiffs and the relevant putative class members are sufficiently cohesive for purposes of determining whether these

portions of the Lease do in fact violate Truth-in-Leasing regulations.

As noted, Defendant does not claim that the Lease was compliant with the regulations. Instead, Defendant argues that injunctive relief is "needless and moot" because Defendant stopped using the Lease at issue in January 2018. Def. Opp'n at 2. However, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice"; in other words, it does not moot the case. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal citations omitted). "If it did, the courts would be compelled to leave the defendant . . . free to return to his old ways." *Id.* (internal citations omitted). A court only finds that a case is moot because of a defendant's voluntary conduct when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citing *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)); *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 283 (N.D. Ill. 2005). In *Allied Van Lines, Inc.*, the defendant similarly argued that Rule 23(b)(2) class certification was moot because defendant was "currently in the process of implementing a new form of lease that addresses each of the claimed [Truth-in-Leasing] deficiencies." *Id.* The Northern District of Illinois found this argument "toothless and wholly unpersuasive." *Id.*

The Court finds Ironbound's mootness argument unpersuasive. Defendant is still free to return to its old Lease form, or otherwise change its current lease. In addition, there has not been an adjudication that the newly-implemented lease complies with the regulations. Therefore, the Court finds that the alleged violations could reasonably reoccur and does not find declaratory and injunctive relief moot.

Accordingly, the Court certifies the following class under Rule 23(b)(2) for declaratory

and injunctive relief[9] regarding Plaintiffs' alleged Truth-in-Leasing violations.

### D. Proposed Rule 23(b)(3) Class

The requirements for Rule 23(b)(3) class certification are that "the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." *Dukes*, 564 U.S. at 362 (emphases added) (citing Fed. R. Civ. P. 23(b)(3)). These are commonly referred to as the "predominance" and "superiority" requirements. *Id.* The Third Circuit has also recognized that "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015). "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Id.* (quoting *Marcus*, 687 F.3d at 593-94). The Court finds Plaintiffs have not met the predominance requirement and, therefore, does not analyze the remaining Rule 23(b)(3) requirements.

Courts have taken different views as to whether alleged violations of the Truth-in-Leasing regulations can be properly adjudicated under Rule 23(b)(3). *Compare Owner Operator Indep. Drivers Ass'n Inc v. New Prime Inc.*, 339 F.3d 1001 (8th Cir. 2003) ("*New Prime*") *with Foster v.*

---

[9] The Court recognizes that there is an issue regarding potential money damages. The Supreme Court in *Dukes*, 564 U.S. at 360, left open the question of whether monetary relief that is "incidental" to the injunctive or declaratory relief may be appropriate under Rule 23(b)(2). Without deciding the issue, the Supreme Court in *Gates*, 655 F.3d at 263, recognized that regardless of whether "incidental" damages are allowed under Rule 23(b)(2), damages are not "incidental" when they "will vary individual by individual," as opposed to flow to the class as a whole. Here, even assuming *arguendo* that Rule 23(b)(2) allows for "incidental" damages, since Plaintiffs are seeking individualized damage determinations, the Court limits the Rule 23(b)(2) class to declaratory and injunctive relief only.

*CEVA Freight LLC*, 272 F.R.D. 171 (W.D.N.C. 2011). In *New Prime*, plaintiff members of the Owner-Operator Independent Drivers Association, Inc. ("OOIDA"), first leased tractors from defendant Success Leasing, Inc. ("Success"), and then leased the same tractors (along with driving services) to defendant New Prime, Inc. ("Prime"). 339 F.3d at 1003. Success and Prime had the same officers, directors, and shareholders; therefore, defendants essentially leased tractors to OOIDA drivers only for OOIDA drivers to lease the tractors back to the defendants. *Id.*

The plaintiffs claimed that their lease with Success violated the Truth-in-Leasing regulations. *Id.* at 1008. The lease at issue included (1) a "Tire Replacement Reserve," whereby Success retained an amount for the purchase of tires, which was to be returned to the driver at the end of the lease less costs for wear on the tires; (2) an "Excess Mileage Charge," which required the driver pay an additional sum for excess mileage (unless the driver purchased the tractor or completed the lease, in which case this charge would be paid back to the driver); and (3) a "Set-Off Provision," which allowed Success to offset amounts the driver owed Success at the end the lease against both the Tire Replacement Reserve and Excess Mileage Charge. *Id.* at 1008-10. The plaintiffs alleged that the Set-Off provision resulted in the Tire Replacement Reserve and the Excess Mileage Charge violating 49 C.F.R. § 376.12(k) as to escrow accounts. *Id.* at 1008.

The Eight Circuit upheld the district court's finding that Plaintiff's Truth-in-Leasing claims were unsuitable for Rule 23(b)(3) class certification. *Id.* at 1012. The Circuit reasoned that "questions affecting individual members of [the] class would predominate over questions of law or fact common to the members." *Id.* To determine individual damages, the *New Prime* court observed, the district court would have to "examine each individual class member's account, including offsets, advances, and other items." *Id.* The Eighth Circuit continued that "[r]ecovery for any plaintiff would be based on individual, not common, questions of fact." *Id.* Therefore, the

Circuit affirmed the district court's denial of Rule 23(b)(3) class certification as to plaintiffs' Truth-in-Leasing claims. *Id.; see also Owner Operator Indep. Drivers Ass'n Inc v. FFE Transp. Servs. Inc.*, 245 F.R.D. 253 (N.D. Tex. 2007) (in Truth-in-Leasing matter, denying Rule 23(b)(3) class certification for owner-operators because allegations of unlawful provisions, omittance of required provisions, failure to provide required documentation, and improper management of escrow accounts and charge-backs required individualized damage calculations that predominated common issues).

Conversely, other courts have found allegations of Truth-in-Leasing violations to be appropriate for Rule 23(b)(3) adjudication. In *Foster*, the plaintiffs contracted to provide trucking equipment and driving services. 272 F.R.D. at 173. The plaintiffs brought an eleven-count complaint, alleging, among other claims, unlawful contractual provisions, omittance of required provisions, failure to provide insurance, failure to assume responsibility for equipment and fines, wrongful withholding of payments, failure to provide required documentation, and improper management of charge-backs in violation of Truth-in-Leasing regulations. *Id.* The plaintiffs also asserted a breach of contract claim. *Id.*

The Western District of North Carolina certified a class under Rule 23(b)(3) as to the Truth-in-Leasing and breach of contract claims. *Id.* at 177. In addressing predominance, the district court reasoned that "every member of the class signed substantially the same CEVA operating agreement" and "[a]s a result, common issues predominate as to whether certain provisions of CEVA's operating agreement . . . violate the [Truth-in-Leasing] Regulations." *Id.* at 176. The *Foster* court found that "the same is true for the breach of contract action," as "if CEVA has breached certain provisions of the operating agreement by failing to comply with the federal regulations, it has breached those provisions in an identical manner for all class members." *Id.*

The defendant argued that individualized damages defeated predominance, but the district court responded that "if such damages are awarded, [then] individualized calculations should not be overly complex." *Id.* at 177. The court in *Foster*, however, did not provide an example of these calculations, or elaborate any further.

The *Foster* court then determined that plaintiffs also met the superiority requirement because "the potential recovery is not enough to distinguish the interests of any single class member" and plaintiffs "have substantially the same operating agreement with CEVA." *Id.* Thus, the Court certified the class under Rule 23(b)(3) for plaintiffs' Truth-in-Leasing and breach of contract claims. *Id.*; *see also Allied Van Lines*, 231 F.R.D. at 286 (certifying a Rule 23(b)(3) class for Truth-in-Leasing violations after concluding that (a) the predominance requirement was met because a class-wide settlement or later decertification as to damages could remedy individualized damage issues, and (b) the superiority requirement was met because plaintiffs were not home much, "constantly driving to far-flung destinations," and the damage amounts were low, suggesting that individual actions were unlikely).

Here, if the issue were solely liability, it appears that Rule 23(b)(3) certification would be appropriate on both the Truth-in-Leasing violations and the breach of contract action because the Lease is the same, or substantially the same, as to all class members. Damage assessments, however, would prove difficult at the class level. Regarding compensation, Defendant argues that Plaintiffs cannot establish that any 70/30 split agreement was ever in effect due to conflicting testimony from lead Plaintiffs. Ans. ¶ 26; Def. Opp'n at 2, 4. Yet even assuming that Plaintiffs could establish the existence of a 70/30 split agreement, the Court agrees that the individualized damages calculations would be unmanageable and also predominate over common questions as to liability. Each individual trip of each Plaintiff would have to be reviewed to determine what each

class member was actually paid for a particular trip. As noted, payment for each trip was individually negotiated with each driver, meaning that no overarching method or formula was employed. Although the parties have not provided an estimate as to the number of trips involved, it appears safe to assume that thousands (if not tens of thousands) of trips were involved. This voluminous, individual review is unworkable for purposes of class adjudication.

Damages related to charge-backs, escrow account management, and administration of workers' compensation appear more appropriate for Rule 23(b)(3) class certification than the compensation issue. Among other things, establishing an accurate baseline would appear to be easier. For example, as to worker's compensation, the calculation should involve a relatively rudimentary comparison of what Defendant paid for insurance as opposed to what Defendant charged Plaintiffs. That is not to say that the Court is finding that predominance or superiority would be met as to these damage calculations – only that they potentially could be.

The parties have not addressed potential subclasses or use of Rule 23(c)(4), which allows the Court to certify a class for particular issues.[10] Fed. R. Civ. P. 23(c)(4). Given that discovery

---

[10] Under Rule 23(c)(4), "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). However, "[a] court's decision to exercise its discretion under Rule 23(c)(4), like any other certification determination under Rule 23, must be supported by rigorous analysis." *Gates*, 655 F.3d at 272 (internal quotations omitted). Rule 23(c)(4) "both imposes a duty on the court to [e]nsure that only those questions which are appropriate for class adjudication be certified, and gives it ample power to treat common things in common and to distinguish the distinguishable." *Id.* (internal citations omitted). When certifying a Rule 23(c)(4) issue class, "the court should clearly enumerate the issue(s) to be tried as a class . . . [and] should also explain how class resolution of the issue(s) will fairly and efficiently advance the resolution of class members' claims, including resolution of remaining issues." *Id.* at 273. The Third Circuit has set forth a number of factors to consider in making this determination. *Id.* The factors include the following:

> [T]he type of claim(s) and issue(s) in question; the overall complexity of the case; the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; the substantive law underlying the claim(s), including any choice-of-

has occurred, the parties are in the best position to address – both factually and legally – whether a potential Rule 23(b)(3) class could be certified on certain issues. The Court is not indicating that it would rule one way or the other. Instead, the Court believes that in the first instance, the issue should be addressed by the parties. Thus, class certification under Rule 23(b)(3) is denied without prejudice. If Plaintiffs believe that a Rule 23(b)(3) class as to a certain issue or issues is appropriate, they are to submit their motion in support thereof within forty-five (45) days. If not, only the Rule 23(b)(2) class will be certified and the Rule 23(b)(3) certification decision will be with prejudice.[11]

Class Definition

Rule 23(c)(1)(B) requires that the class-certification order or incorporated opinion to

---

law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy; the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

*Id.* (citing Principles of the Law of Aggregate Litigation §§ 2.02-05 (2010)).

[11] The Court notes that by granting class certification under Rule 23(b)(2) for declaratory and injunctive relief and denying class certification under Rule 23(b)(3) for monetary damages, the Court is not precluding Plaintiffs from bringing individual actions against Defendant for monetary damages. *See Morrow v. Washington*, 277 F.R.D. 172, 204 (E.D. Tex. 2011) (recognizing that "any putative class members who wish to pursue individual claims for monetary damages will not be adversely affected by the fact that the Court has chosen to certify a class for injunctive and declaratory relief and not monetary damages.").

indicate "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Byrd*, 784 F.3d at 163 (citing *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir.2006)). Therefore, the Court certifies the following class under Rule 23(b)(2) for declaratory and injunctive relief regarding Plaintiffs' alleged Truth-in-Leasing violations:

> All independent owner-operators who entered into a regulated lease with Defendant, directly or indirectly through Defendant's agents, and whose regulated lease was in effect at any time between April 20, 2007 through the pendency of this action.
>
> Excluded from this class are Plaintiffs' counsel, officers and directors of Defendant, judicial officers assigned to this case, and staff and immediate relatives of judicial officers assigned to this case.

The Court also conditions class membership on compliance with the applicable statutes of limitations.

## V. CONCLUSION

For the reasons stated above, and for good cause shown, Plaintiff's second motion for class certification (D.E. 179) is granted in part and denied in part. The Court certifies the above-described Rule 23(b)(2) class. Plaintiffs' second motion for class certification is denied without prejudice as to the proposed Rule 23(b)(3) class and is denied with prejudice as to the proposed Rule 23(b)(1) class. An appropriate Order accompanies this Opinion.


Dated: December 27, 2018


John Michael Vazquez, U.S.D.J.

34