**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VAUDRAL LUXAMA, CHANDLER LUXEUS, JAVIER R. GARCIA, FREDO BONHOMME, SANTOS MALDONADO, and CHANEL FONTIN, *each individually and as class representatives*,<br><br>             *Plaintiffs*,<br><br>      v.<br><br>IRONBOUND EXPRESS, INC.,<br><br>             *Defendant*. | Civil Action No. 11-2224<br><br>**OPINON** |

**John Michael Vazquez, U.S.D.J.**

　　This case arises out of lease agreements (the "Lease" or "Leases") between Plaintiffs[1] and Defendant Ironbound Express, Inc. ("Defendant" or "Ironbound"). Plaintiffs are "owner-operator" tractor-trailer drivers who lease their vehicles and driving services to Defendant. This matter began as a wage and hour claim but has since morphed into allegations that the Leases violated federal Truth-in-Leasing regulations (the "Regulations"), 49 C.F.R. § 376.1 *et seq*., and for breach of contract. Currently pending before the Court are the parties' motions for summary judgment, D.E. 281, D.E. 282. The motions were decided without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). The Court has considered the parties' submissions[2] and, for the reasons stated below, the parties' motions for summary judgment are

---

[1] The named Plaintiffs consist of Vaudral Luxama, Chandler Luxeus, Javier R. Garcia, Fredo Bonhomme, Santos Maldonado, and Chanel Fontin (collectively "Plaintiffs").

[2] Plaintiffs' brief in support of their motion is referred to as "Pl. Br.," D.E. 281-3; Defendant's

granted in part and denied in part.  The Court is only ruling on the summary judgment motions on a classwide basis.  In its recent Opinion as to Class Certification, D.E. 331 ("Class Cert. Op."), the Court found that certain claims were not appropriate for class treatment but that Plaintiffs could proceed on an individual basis.  If Plaintiffs do go forward on an individual basis on those claims, the Court will permit the parties to submit separate summary judgment motions in those matters.

## I.   BACKGROUND[3]

### A.  Factual Background

Plaintiffs' claims stem from standard lease agreements between Plaintiffs and Defendant. Plaintiffs allege that the Leases violate the Regulations and/or were breached as to the following areas: (1) compensation, (2) deductions/charge backs, (3) escrow funds, (4) workers' compensation insurance, (6) fuel surcharges, (7) parking-space rental requirements, and (8) detention time.  TAC ¶¶ 50-99.[4]  Plaintiffs' Third Amended Complaint ("TAC") asserts six counts – one count for breach of contract and five counts alleging various violations of the Regulations. *Id*.

Defendant is an intermodal container and chassis transport company based in Newark, New

_____

opposition is referred to as "Def. Opp" D.E. 296; Plaintiffs' reply is referred to as "Pl. Reply," D.E. 330; Defendant's brief in support of its motion is referred to as "Def. Br.," D.E. 282-1; Plaintiff's opposition is referred to as "Pl. Opp.," D.E. 297; Defendant's reply is referred to as "Def. Reply," D.E. 321.

[3] The facts are derived from Plaintiffs' Third Amended Complaint ("TAC"), D.E. 118; Defendant's Answer ("Ans."), D.E. 120; Plaintiffs' Statement of Undisputed Material Facts ("Pl. SOMF"), D.E. 255; Defendant's Responsive Statement of Material Facts in Support of its Opposition to Plaintiffs' Motion For Summary Judgment ("Def. RSOMF"), D.E. 270; Defendant's Statement of Material Facts ("Def. SOMF"), D.E. 282-2; and Plaintiffs' Response to Defendant's Statement of Material Facts ("Pl. RSOMF"), D.E. 242.

[4] In this section, the Court addresses factual assertions that are relevant to the claims generally. Factual assertions and apparent disputes specific to the parties' arguments are resolved in the analysis section of this Opinion.  *See* Op. at 16-50.

Jersey.  Def. SOMF ¶ 1; Pl. RSOMF ¶ 1.  Defendant contracts with steamship lines and other customers to transport shipping containers and chassis to and from ports, shipping terminals, and customer locations throughout the Northeast and elsewhere in the United States.  Def. SOMF ¶ 2; Pl. RSOMF ¶ 2.  Named Plaintiffs are six individuals who perform services as owner-operator truck drivers and who leased or currently lease their tractors to transport shipping containers and/or chassis for Defendant.  Pl. SOMF ¶ 5; Def. RSOMF ¶ 5.

Defendant engages drivers, such as Plaintiffs, to provide transportation services pursuant to a form, written lease agreement.  Pl. SOMF ¶ 10; Def. RSOMF ¶ 10.  Defendant and each Plaintiff have entered into Lease agreements, under which Plaintiffs leased their services and their tractors to Defendant.  Pl. RSOMF ¶ 5.  The Lease is effective for a 90-day term which automatically renews for subsequent 90-day terms, unless terminated by either party on 30 days' written notice.  Def. SOMF ¶ 19; Pl. RSOMF ¶ 19.

The parties appear to dispute whether the Lease between Defendant and each Plaintiff are the same.  *See* Def. RSOMF ¶ 12.  Plaintiffs contend that "[t]he terms of the [l]ease attached as Exhibit A to the Third Amended Complaint and the Lease with each of the Named Plaintiffs are identical."  Pl. SOMF ¶ 12.  Defendant disputes this statement, but "admits the lease document speaks for itself."  Def. RSOMF. ¶ 12.  Defendant also fails to provide evidence as to differences in the Leases.  In fact, Defendant refers to the material terms within the Lease without distinguishing any differences among the Leases.  *See e.g.*, Def. Br. at 19 (referring to "Ironbound's Lease" without distinction); *see also* Def. SOMF ¶ 7 (referring to "[t]he Lease Agreement" without distinction.).  And throughout its own L. Civ. R. 56.1 statement of material facts, Defendant does not distinguish between Leases and instead refers to the "Lease Agreement" generally when describing the terms of the Lease.  *See generally* Def. SOMF.  In short, Defendant

fails to point to any evidence demonstrating that there are differences among the Leases or otherwise create a genuine dispute of material fact that the Leases are different. Because there is no difference among the Leases, the Court hereafter refers to the Lease in the singular.

The parties' disputes center on several key provisions of the Lease. The Lease provides that Defendant pay Plaintiffs "per move." Pl. RSOMF ¶ 21. Paragraph two of the Lease governs owner-operator compensation. In relevant part, Paragraph two provides as follows:

> In consideration of the furnishing of the aforesaid equipment and the services required by Lessee for its operation, Lessee agrees to pay Lessor according to the terms of Schedule B annexed hereto. Payment shall be made on a per-trip basis according to the terms of Schedule B.

D.E. 177-3, Ex. 3 at 1 (hereinafter "Lease"); Pl. SOMF ¶ 21; Def. RSOMF ¶ 21. Thus, pursuant to the Lease, the terms of compensation were to be set forth in Schedule B. Schedule B, however, was not attached to the Lease. Pl. SOMF ¶ 23; *see also* Def. RSOMF ¶ 23 ("Schedule B was not included with the Lease Agreements because 'Schedule B was the trip sheets that the drivers would get each individual trip that they made.'").

Defendant contends that the "trip sheets that the drivers would get each individual trip they made" constitute "Schedule B." Def. SOMF ¶ 10. Plaintiffs admit that trip sheets "included origin and [destination] points and pickup and delivery time," and that some "trip sheets indicated" payment. Pl. RSOMF ¶ 12. However, Plaintiffs dispute that the trip sheets constitute Schedule B. Pl. RSOMF ¶ 10. Plaintiffs point to the testimony of Christopher Krawiec, Defendant's general foreman. Krawiec testified that he had never seen a Schedule B and that while he saw the reference to Schedule B in the Lease, "it had never been attached to the lease." D.E. 297-3, Ex. H at 54:22-25. However, Krawiec went on to testify that "if anything, [Schedule B] would be the sheet that the driver would receive when they agree to do a trip from the dispatch office," apparently referring

to the trip sheets. *Id*. at 54:22-55:1. Plaintiff Maldonado testified that the trip sheets were not Schedule B. D.E. 297-3, Ex. H at 140:11-13. Plaintiff Bonhomme also testified that the trip sheets were not Schedule B. D.E. 297-3, Ex. A at 168:5-10. On the other hand, Carmen Pizzuto, Defendant's Vice President of Operations, testified that the trip sheets were Schedule B. D.E. 282-4, Ex. 1 at 117: 13-25 ("Schedule B was the trip sheets that the drivers would get each individual trip that they made."). Thus, it is undisputed that there was no Schedule B attached to the Lease, the trip sheets were not labeled Schedule B, and the trip sheets were not attached to the Lease.

As to expenses, in relevant part, Paragraph 6 of the Lease provides that Defendant will pay the following expenses:

> Obtaining road use and fuel tax permits for each unit of lease equipment as provided in Section B infra, (b) Lessors empty back-haul miles when no load is available from Lessee, (c) all fines and penalties on overweight or oversize trailers or containers which it directs Lessor to haul on its behalf whenever the loading of their contents is supervise by Lessee, and (d) where detention charges and accessorial services are chargeable to and collectible from shippers and/or consignees under applicable I.C.C. rules and regulations. Lessee shall compensate Lessor for any such detention period and/or accessorial services performed at the rates set forth in schedule B.

Lease ¶ 6; Def. RSOMF ¶ 22. Pursuant to the Lease, the owner-operators agree to pay the entire cost of operating and maintaining the tractor, including fuel, lubrication, maintenance, repair, tolls, highway use taxes, traffic fines, and license plate costs. Lease at 3.

The Lease contain various provisions permitting Defendant to deduct (or chargeback) certain amounts from drivers' settlements. Paragraph 20 of the Lease also addresses chargebacks. In relevant part, Paragraph 20 provides for the following chargebacks:

> (a) any tax or cost of operating or maintaining the leased equipment including all expenses specified in Section 6 hereof and any cost of releasing the lease equipment or its cargo except as is otherwise made the obligation of Lessee in this Lease.

(b) any fines or penalties imposed upon Lessee as a result of violations by Lessor, or any of its agents, servants or employees of any I.C.C. or D.O.T. rule or regulation or of any other law, regulation or ordinance of any federal, state or municipal Authority having jurisdiction.

(c) any losses or expenses incurred by Lessee as a result of the failure of Lessor, or any of its agents, servants or employees to remit to Lessee any monies collected on behalf of Lessee.

(d) any losses or expenses incurred by Lessee as a result of its inability to collect freight charges earned due to Lessee's failure to properly complete and submit the paperwork and documents set forth in Section 7 hereof.

(e) any loss of or damage to property or cargo or any other losses or expenses which Lessee may incur or for which it may be held liable as a result of Lessor's conduct hereunder.  Prior to effecting any withholding against Lessor for such loss, expenses or liabilities, Lessee shall provide Lessor with a written explanation and itemization of the withholding to be made.

Lease ¶ 20; Pl. SOMF ¶ 27; Def. RSOMF ¶ 27.

In addition, the Lease provides the following as to workers' compensation insurance:

[Driver] agrees to procure and pay the full expense of . . . Worker's Compensation insurance. . . . In the event [driver] is unable to obtain suitable Worker's Compensation insurance, [driver] hereby authorizes [Defendant] to procure and pay for such insurance as [driver]'s agent, and to charge back the cost of such insurance against any settlements due [driver] hereunder at a rate and on a schedule to be agreed upon between [Defendant] and [driver]. [Defendant] shall provide [driver] with a Certificate of Insurance for any policy of Worker's Compensation insurance which it may purchase on [driver]'s behalf which shall specify the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, and the deductible amounts for which [driver] may be liable under each type of coverage. Upon request, [Defendant] shall supply [driver] with a copy of any such policy which it may purchase on [driver]'s behalf.

Lease ¶ 17.  Plaintiffs claim that "[f]or the years 2008 to 2011, inclusive, Ironbound charged the drivers $2,162,578 for workers compensation insurance."  Pl. SOMF ¶ 45.  Plaintiffs add that this

6

was "$524,219 more" than Defendant's cost to procure the coverage." *Id.* ¶ 48. Among other things, Defendant counters that over the years it subsidized "more than $820,000 in workers compensation premiums for drivers." Def. RSOMF ¶ 48.

In addition, the Lease mandates the maintenance of an escrow account called the "Driver Deposit Fund," whereby Defendant "shall maintain an escrow fund throughout the term of this Lease to be used for the adjustment of claims between the parties to this Lease." Lease ¶ 18. Under Paragraph 18, Plaintiffs agreed "to pay the sum of $1000.00 into the fund and to replenish the fund as necessary throughout the term of this Lease to maintain it at a minimum level of $1000.00 at all times." *Id.* The Lease permits Defendant to charge the escrow fund for the following losses caused by a Plaintiff's negligence or maintenance:

> (1) loss of freight charges, (2) damage to cargo, (3) damage to property by the [driver], (4) damage to other property for which the [Defendant] may be held liable, and (5) uprighting and towing. In the event such losses exceed $10.00 or the monies available in the escrow fund, [Defendant] may withhold from any settlements due the [driver] sufficient sums to cover its expenditures, losses, or liabilities in connection with such losses. Whenever such a charge or withholding is being made, the [Defendant] will provide the [driver] with a written explanation therefore.

*Id.* The Lease continues that Defendant "agrees to provide the [driver] upon reasonable request, with a summary written accounting of any and all transactions involving the escrow fund," indicating "the amount and description of any deductions." *Id.*

### B. Procedural History

Plaintiffs filed their initial Complaint on April 19, 2011, alleging claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and New Jersey's Wage and Hour Law ("NJWHL"), N.J.S.A. 34:11-4.4 *et seq.* D.E. 1. One hundred and eighty-eight (188) drivers opted into the case with respect to the FLSA claim. D.E. 3-8, 17, 21-22, 26, 29, 36, 40, 42, 45, 50, 51,

53, 55-61, 76, 78.  Defendant moved to dismiss the Complaint.  D.E. 19.  On October 20, 2011, Plaintiffs filed their first motion for class certification on the FLSA claim.  D.E. 46.  On June 28, 2012, Judge Salas granted Defendant's motion to dismiss Plaintiffs' Complaint without prejudice, finding that Plaintiffs failed to allege sufficient facts supporting the assertion that they are "employees" of Defendant, which is required for their FLSA claim.  D.E. 77, 78.  The determination mooted Plaintiffs' first motion for class certification.  *Id.*

Plaintiffs filed their First Amended Complaint ("FAC") on July 30, 2012, again alleging that they are "employees" of Defendant for purposes of the FLSA, and this time adding a claim for violations of the Regulations, 49 C.F.R. § 376.1 *et seq.*  D.E. 79.  Defendant again moved to dismiss.  D.E. 81.  On June 27, 2013, Judge Salas dismissed Plaintiffs' FLSA claim without prejudice, again finding that Plaintiffs pled insufficient facts to support that they are "employees" of Defendant, and dismissed without prejudice Plaintiffs' claims under the Regulations.  D.E. 97, 98.

Plaintiffs filed their Second Amended Complaint ("SAC") on July 26, 2013, alleging the same claims for relief.  D.E. 100.  Defendant again moved to dismiss, positing largely the same arguments as in its previous two motions.  D.E. 106.  On July 30, 2014, Judge Salas heard oral argument on the motion.  D.E. 112.  The next day, the parties entered into a stipulation whereby Plaintiffs withdrew all of their counts except two FLSA claims, a breach of contract claim, and claims under the Regulations.  D.E. 113.  Judge Salas then dismissed Plaintiffs' FLSA claims with prejudice and Plaintiffs' breach of contract and claims under the Regulations without prejudice. D.E. 115.

Plaintiffs followed with their TAC, alleging (1) violations of the Regulations, seeking declaratory and injunctive relief, damages, and attorneys' fees, as well as (2) breach of contract.

8

D.E. 118.  On January 31, 2018, Plaintiffs and Defendant moved for partial summary judgment, D.E. 177, 178, which were later terminated, D.E. 196.  On the same day, Plaintiffs also filed a motion for class certification, D.E. 179.

On January 29, 2019, Defendant requested leave to file a motion for summary judgment, accompanied by its statement of material facts.  D.E. 236.  Plaintiffs filed their letter in opposition, D.E. 239, later submitting their responsive statement of material facts, D.E. 242.  On April 1, 2019, Plaintiffs requested leave to file a motion for summary judgment, accompanied with their statement of material facts.  D.E. 255.  Defendant filed its opposition and its responsive statement of material facts.  D.E. 270.  The Court then granted leave to the parties to file their respective summary judgment motions.  D.E. 273, 274.  Plaintiffs filed their motion for summary judgment, D.E. 281, to which Defendant filed opposition, D.E. 296.  Defendant also filed its motion for summary judgment, D.E. 282, to which Plaintiffs filed opposition, D.E. 297.

Defendant then moved to strike, D.E. 295, D.E. 303, certain evidence that Plaintiffs submitted with their summary judgment motion.  Plaintiffs cross-moved to supplement their Statement of Undisputed Material Facts.  D.E. 310, D.E. 314.  On July 6, 2020, the Court struck all evidence submitted that was "not previously cited as evidentiary support in Plaintiffs' original statement of material facts, D.E. 255, or responsive statement of material facts, D.E. 242."  D.E. 316 at 6.  After the parties filed their reply briefs in further support of their motions for summary judgment, Defendant moved to strike Plaintiffs' reply, D.E. 322, for failure to comply with the page limit provided under this Court's Local Civil Rules.  D.E. 323.  On October 1, 2020, the Court struck Plaintiffs' initial reply brief but permitted Plaintiffs to refile.  D.E. 329.

## II.   LEGAL STANDARDS

### A.  Summary Judgment Standard

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment.  *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party.  *Anderson*, 477 U.S. at 250.  "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment."  *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d

523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322.  "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 250-51.

### III. ANALYSIS

#### A.  Plaintiffs' Breach of Contract Claims

Plaintiffs' breach of contract claim is based on an alleged oral agreement whereby "Defendant agreed to pay *all* drivers (1) seventy percent of the fees paid by Defendant's customers, and (2) any amount Ironbound collected (i) for detention time in excess of two hours . . . and/or (ii) fuel surcharges." Pl. Opp. at 3 (emphasis added).  Defendant and Plaintiffs move for summary judgment as to certain aspects of Plaintiffs' breach of contract claims.  Defendant seeks summary judgment on Plaintiffs' breach of contract claim stemming from Defendant's alleged failure to pay Plaintiffs 70 percent of the revenue for the trips Defendant assigned them.  Def. Br. at 6-13.  On the other hand, Plaintiffs seek summary judgment on their claim that Defendant breached section 17(b) of the Lease.  Pl. Br. at 13-16.

To prevail on a breach of contract claim under New Jersey law,[5] a plaintiff must demonstrate (1) the existence of a valid contract; (2) breach of the contract; (3) damages as a result of the breach; and (4) that the complaining party performed its own duties under the contract. *Pollack v. Quick Quality Rests., Inc.*, 172 A.3d 568, 576 (N.J. Super. App. Div. 2017) (citing *Globe*

---

[5] The Lease states that "this Lease, and all of the terms and conditions contained herein, will be interpreted according to the laws of the State in which the Lease is executed."  D.E. 245-1, Ex. 1, ¶ 27.  Plaintiffs' Leases were all executed in New Jersey.  D.E. 179-5 at 9, 18, 29, 38, 48, 58. Therefore, the Court applies New Jersey law to Plaintiff's claim for breach of contract.

*Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016)).  In addition, "a party must prove the existence

of a contract by showing that: (1) there was a meeting of the minds; (2) there was an offer and

acceptance; (3) there was consideration; and, (4) there was certainty in the terms of the agreement."

*Allen v. Bloomingdale's, Inc.*, 225 F. Supp. 3d 254, 258 (D.N.J. 2016) (internal quotations

omitted).  Acceptance of a contract must be absolute and unequivocal.  *Kristensons Petroleum,*

*Inc. v. Explorer Maritime Cruises, LLC*, No. 14-5683, 2018 WL 497070, at *6 (D.N.J. Jan 22,

2018) (citing *Cumberland Farms, Inc. v. N.J. Dept. of Envtl. Protec.*, 148 A.3d 767, 776 (N.J.

Super. App. Div. 2016)).  These required elements apply to both express and implied contracts.

*Gardiner v. V.I. Water & Power Auth.*, 145 F.3d 635, 644 (3d Cir. 1988).

### 1.  Defendant's Motion for Summary Judgment as to Plaintiffs' Contract Claims

Defendant raises several grounds as to dismissal of Plaintiffs' breach of contract claim

stemming from Defendant's alleged failure to pay Plaintiffs pursuant to the 70/30 split.  First,

Defendant argues that Plaintiffs cannot establish the requisite meeting of the minds to form an

agreement that Defendant agreed to pay Plaintiffs the 70/30 split.  Def. Br. at 6.  Next, Defendant

argues that application of the parol evidence rule prohibits Plaintiffs from introducing the alleged

70-percent promise, which Defendant claims contradicts the Lease.  *Id*. at 8-9.  Defendant further

contends that the parties' course of dealings and the fact that several Plaintiffs signed more than

one Lease which provided for Plaintiffs to be paid on a "per-trip" basis also defeats Plaintiffs'

claims.  *Id*. at 10-11.  Finally, Defendant argues that Plaintiffs are estopped from asserting the 70-

percent promise after years of negotiating trips on a per-trip basis.  *Id*. at 12.  Plaintiffs respond

that Defendant's meeting-of-the-minds argument is a jury issue. Pl. Op. at 17-18.  Plaintiffs further

argue that Defendant's parol evidence and merger clause arguments fail because the Lease is

incomplete because a Schedule B was not attached.  *Id*. at 19-23.

In attempting to prove that there was no meeting of the minds, Defendant cites to testimony of Plaintiffs.  Specifically, Plaintiff Garcia testified that, although he initially thought the Lease contained a provision requiring Defendant to pay him based on the 70/30 split, his belief was mistaken.  *See* D.E. 282-4, Ex. 2 at 119:7-120:15.  Plaintiff Luxeus' understanding that he was supposed to be paid based on the 70/30 split was based on a supposed industry standard, not on an oral promise.  D.E. 282-5, Ex. 5 at 60:2-121.  Plaintiff Fontin testified that his understanding of the compensation was based on a lease agreement he signed with another intermodal transport company.  D.E. 282-6, Ex. 8 at 40:13-19.  Although Defendant claims that Plaintiff Luxama failed to identify an oral contract and "claims he is entitled to 70% because it is an 'industry standard,'" Def. SOMF ¶ 110, the portions of the record Defendant cites do not support that claim.  *See* D.E. 282-5, Ex. 3 at 147.  However, Plaintiff Luxama did testify that he believed he was entitled to fuel surcharge payments because "in the business that's how it is."  D.E. 282-5, Ex. 3 at 34.  Defendant admits that Plaintiff Maldonado and Plaintiff Bonhomme testified that they were verbally promised seventy percent of the fees paid by Defendant's customers.  Def. SOMF ¶ 112, *id*. ¶ 114.

Defendant also relies on the testimony of its employees.  When asked whether she ever discussed with driver applicants whether the drivers "would get a percentage of what the shipping company was paying to Ironbound for a move as their pay for that particular trip," Defendant's Vice President of Operations, Carmen Pizzuto, testified she had "never had that discussion with a driver."  D.E. 282-4, Ex. 1 at 59:8-16.  Ms. Pizzuto also testified that she did not "know anything about a percentage . . . [e]ach trip was an individual basis."  *Id*. at 86:13-24.  And when asked whether she had ever been told that Defendant paid drivers "based on the percentage of what a customer is charged for a move" Ms. Pizzuto replied "[n]o."  *Id*. at 90:4-7.  Chris Krawiec, Defendant's General Foreman and Yard Manager who certain Plaintiffs allege promised they

13

would be paid pursuant to the 70/30 split, testified that he never made such a promise to any driver. D.E. 282-6, Ex. 7 at 17:6-12.  Plaintiffs do not cite evidence from any of Defendants' employees to rebut the testimony of Pizzuto and Krawiec.  *See* Pl. RSOMF ¶ 97.

To rebut the testimony of Plaintiff Garcia that Defendant cited, Plaintiffs claim that "Garcia testified that it was a verbal agreement."  Pl. RSOMF ¶ 113.  In response to Defendant's counsel's question asking for the basis of his understanding he was entitled to the 70/30 split, Plaintiff Garcia testified "[w]ell, at first I thought it was in the lease agreement, which it was not.  It was basically a verbal agreement of the 70 percent."  D.E. 297-3, Ex. C at 63:13-23.   As to Plaintiff Luxeus' testimony, Plaintiffs appear to deny the substance but then admit "[Luxeus] testified about an industry standard."  Pl. RSOMF ¶ 111.  To rebut Luxeus' testimony, Plaintiffs also direct the Court to their responses 97 through 110 of their RSOMF.  Only Plaintiffs' responses 97 and 102 reference testimony from Plaintiff Luxeus.  Response 97 references the following testimony:

> Q. Did anyone at Ironbound tell you we're going to pay you 70 percent?
>
> A. Well, certain guys, you know, they got guys, you know, they tell them, you know, they will pay them 70 percent.
>
> Q. Did anyone ever tell you that?
>
> A. I don't remember because, you know, I've  been start [*sic*] from Ironbound since ten years ago, since 2002 and then I don't remember."

D.E. 297-3, Ex. E at 61:3-9; *see also* Pl. RSOMF ¶ 97.  Response 102 references the following testimony:

> Q. And during that period of time at what point did you decide you wanted to sue Ironbound?
>
> A. Well, we tried to sue Ironbound for so may irregulation [*sic*]. Number one, we got a lease agreement, it was the fake lease argument [*sic*], the section B is not on it.  The second we got 70

percent don't respect.  They has to pay us at least 70 percent from
each delivery we did.  Why they don't respect that.

D.E. 297-3, Ex. E at 10: 11-23.  Neither of these statements rebut Mr. Luxeus' testimony that his

understanding that he was to be compensated pursuant to the 70/30 split was based off an industry

standard and not a promise from one of Defendant's employees.  *See* D.E. 282-5, Ex. 5 at 60:2-21.

Indeed, Mr. Luxeus testified that he did not recall whether he was promised the 70/30 split by

anyone on behalf of Defendant.  D.E. 297-3, Ex. E at 61:3-9.

As to Defendant's assertion that "Luxama identifie[d] no oral contract but claims he is

entitled to 70% because that is the 'standard' in the truck industry," Plaintiffs merely deny this

assertion without record support and refer the Court to Plaintiffs' responses 97-110.  Pl. RSOMF

¶ 110.  But none of those responses reference any testimony by Plaintiff Luxama.  There is no

evidence that Luxama identified an oral contract for the 70/30 split in his deposition testimony.

Plaintiffs also attempt to rebut the testimony of Plaintiff Fontin on which Defendant relies.

Plaintiffs point to the following testimony:

Q. So why did you sue Ironbound?

A. Firstly, I'm working at Ironbound.  It's been since January 2003.
When I went to Ironbound the person who hire me during the
interview process – I was working at a company before, and I went
there with all the documents from that company that I was working
at before, because I don't speak English well.  I showed him from
the previous company so that we can have an understanding if he's
going to pay me the same way as the other company that I was
working for.

Q. Okay.

A. And he said yes, that he's going to pay me the same way. And I
start working with him, and he didn't pay me the same way.

D.E. 297-3, Ex. B at 9:20-10:8; *see also* Pl. RSOMF ¶ 113.  Plaintiffs further refer the Court to the

following testimony:

Q. Did you exchange any - - did you have any other conversation with Chris at this time?

A. When he called me and gave me the paper for the application and then I just said - - and I asked him is he going to pay me the same way I was working at H&M, he said yes.

D.E. 297-3, Ex. B at 22:6-11; Pl. RSOMF ¶ 113.

Based on the Court's review of the evidence, Plaintiffs Maldonado and Bonhomme each testified as to the existence of an oral promise by Defendant to pay drivers the 70/30 split. Plaintiff Fontin testified that Defendant's representative promised to pay Fontin the same as Fontin's prior employer, which was apparently a 70/30 split. Plaintiffs Garcia, Luxeus, and Luxama failed to identify an oral promise by Defendant to pay drivers the 70/30 split. Those drivers either mistakenly believed the 70/30 promise was contained in the lease or claimed that they were entitled to the 70/30 split based on industry standards. Defendant's employees Pizzuto and Krawiec testified that they never promised the 70/30 split to any driver.

Turning to the summary judgment standard, the Court first finds that, based on the testimony of Defendant's representatives, there is a genuine dispute of material fact as to whether Defendant ever verbally promised to pay Plaintiffs a 70/30 split. In addition, there is no genuine dispute that *all* named Plaintiffs did *not* testify as the verbal agreement for the 70/30 split. In fact, in its recent Opinion as to Class Certification, the Court made a similar finding. Because not all named Plaintiffs indicated that their understanding of the 70/30 split was based on a verbal agreement with Defendant, the Court denied class treatment of this issue. Class Cert. Op. at 22-23. To be clear, the Court is not ruling that the named Plaintiffs cannot pursue individual cases for breach of contract as to the compensation amount, they just cannot do so as a class. And no Plaintiff is entitled to summary judgment on the issue because the evidence shows that there is a

genuine dispute of material fact as to the existence of the agreement.[6]

Although the vast majority of Defendant's arguments focus on Plaintiffs' claim as to the alleged oral promise for the 70/30 split, Defendant briefly discusses Plaintiffs' claims for unpaid fuel surcharges and detention time. *See* Br. at 8-13. As to Plaintiffs' claim for unpaid fuel surcharges, the Court found that "the named Plaintiffs' testimony indicates that there was not a uniform agreement as to reimbursement for fuel surcharges" and therefore denied class treatment of this issue. Class Cert. Op. at 22-23. Thus, as with Plaintiffs' claims based on the 70/30 split, Defendant is free to pursue a motion for summary judgment on the individual cases.

Defendant also appears to argue that it is entitled to summary judgment as to Plaintiffs' claim that Defendant failed to properly compensate them for their detention time. The Court found that Plaintiffs' may maintain their claim for unpaid detention time on a classwide basis. Class Cert. Op. at 23-24. Defendant argues that it is entitled to judgment as to Plaintiffs' claim based on detention time under the parol evidence rule and the Lease's merger clause. Br. at 8-9. However, Defendant fails to explain how Plaintiffs' claims as to detention time contradict the terms of the Lease. In relevant part, the Lease provides that:

> [Defendant] shall pay the expense of  . . . (d) where detention charges and accessorial services are chargeable to and collectible from shippers and/or consignees under applicable I.C.C. rules and regulations. *[Defendant] shall compensate Lessor for any such detention period a*nd/or accessorial services performed *at the rates set forth in Schedule B.*

---

[6] As noted, the Court is only ruling on the motions on a classwide basis. Defendant is free to pursue another motion for summary judgment on the individual cases. As to Plaintiffs who testified that they verbally agreed to the 70/30 split, there appears to be a genuine dispute of material fact that would preclude summary judgment. However, as to Plaintiffs who merely indicated that their understanding was based on industry custom and standard – without any type of acknowledgement or agreement by Defendant – Defendant may be entitled to summary judgment.

Lease ¶ 6 (emphases added).  The Lease also contains the following clause:

> It is understood and agreed between the parties hereto that with
> respect to the leased equipment this Lease cancels and supersedes
> all pre-existing lease agreements between them and that this Lease
> and the exhibits hereto set forth the entire agreement between them.
> It is further understood and agreed by the parties that this Lease may
> be modified by a writing executed by both parties.

Lease ¶ 23.

In New Jersey, "the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document." *Conway v. 287 Corp. Ctr. Assocs.*, 901 A.2d 341, 346 (N.J. 2006).  Thus, Defendant appears to be arguing that Plaintiffs' claim for detention time is barred by the parol evidence rule because it alters the terms of the Schedule B described in Paragraph 6 of the Lease.  However, as discussed above, it is undisputed that there was no Schedule B attached to the Lease, that the trip sheets were not labeled Schedule B, and that the trip sheets were not attached to the Lease.  Defendant otherwise fails to demonstrate undisputed terms of the Schedule B or explain how Plaintiffs' alleged oral promise for detention alters Schedule B.

Defendant appears to also argue that the parties' course of performance over 10 years demonstrates the agreement as to detention time described in Plaintiffs' allegations is nonexistent. Br. at 10-12.  Plaintiffs allege that Defendant promised to pay them for any detention time beyond two hours.  *See* TAC ¶ 26.  Over the course of the Parties' relationship, Defendant admits to paying detention time to Plaintiffs.  Def. SOMF ¶ 60-64.  Defendant does not clearly explain how Plaintiffs' alleged agreement is inconsistent with the parties' course of performance; rather, Defendant points to paragraphs 46 and 54 of its SOMF and generally states "Plaintiffs' theory that drivers were to be paid fuel surcharges and for all detention time also is inconsistent with the parties' course of business during the relevant period."  Br. at 11.  Paragraph 46 of Defendant's SOMF discusses how Defendant purportedly determined rates and does not actually mention

18

detention time.  Paragraph 54 states as follows:

> Detention refers to extra payments due when a driver is delayed . . .
> at a terminal or customer location.   Under the circumstances,
> Ironbound can charge a terminal or customer extra amounts for
> detention, and under certain circumstances, Ironbound will pay
> additional amounts to a driver for detention time.

Def. SOMF ¶ 54.  Plaintiffs' dispute this.  *See* Pl. RSOMF ¶ 61.  As to detention time, Plaintiff

Fontin testified: "When you get to the port, they give you paperwork after two hours.  If you do

three hours, they pay you $25.  Ironbound doesn't pay you."  D.E. 297-3, Ex. B. at 136:17-19.

When asked why Defendant did not pay for detention time, Fontin responded: "Even when you

write it on paper, they don't pay."  *Id*. at 136:20-22.  Plaintiff Luxama also testified that Defendant

never gave him a form to fill out for detention time, D.E. 297-3, Ex. D at 32:8, and that he was

never paid detention time, *id*. at 29:13-15; *see also id*. at 31:14-20.   Plaintiff Bonhomme also

testified he was never paid detention time.  D.E. 297-3, Ex. A. at 56:24-57:6 ("Q. So is it your

testimony that Ironbound never paid you for detention.  A. No. Q. Not even a penny? . . . .")).

There are material facts in dispute as to the parties' course of dealing regarding detention time, but

there is no dispute that Paragraph 6 of the Lease required Defendant to pay Plaintiffs' detention

time when the time was chargeable to shippers.  Lease ¶ 6.  Defendant's motion for summary

judgment as to Plaintiffs' claim for unpaid detention time under Count One is denied.

### 2.   Plaintiffs' Motion for Summary Judgment as to Their Claim for Breach of the Lease Agreement

Plaintiffs argue that they are entitled to summary judgment on their claim that Defendant

breached Paragraph 17(b) of the Lease.  Pl. Br. at 13-15.  Plaintiffs assert that Defendant breached

that paragraph because it is undisputed that Defendant overcharged Plaintiffs for workers'

compensation insurance.  *Id*.  Defendant counters that it charged drivers substantially less than the

statutory minimum for workers' compensation insurance and that summary judgment cannot be

granted based on Defendant's ability to offset damages.  Def. Opp. at 14-16.

Section 17(b) of the Lease, in relevant part, provides as follows:

> In the event Lessor is unable to obtain suitable Worker's Compensation insurance, Lessor hereby authorizes Lessee to procure and pay for such insurance as Lessor's agent and *to charge back the cost* of such insurance against any settlements due Lessor *at a rate and on a schedule to be agreed upon between Lessee and Lessor.* Lessee shall provide Lessor with a Certificate for any policy of Workers Compensation insurance which it may purchase on Lessee's behalf which shall specify the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, and the deductible amounts for which Lessor may be liable under each type of coverage.  Upon request, Lessee shall supply Lessor with a copy of any such policy which it may purchase on Lessor's behalf.

Lease ¶ 17(b) (emphases added); Def. RSOMF ¶ 46.

Plaintiffs claim Defendant breached Paragraph 17(b) by charging back more than "the cost" of the workers' compensation insurance.[7]  Pl. Br. at 13-15; Pl. SOMF ¶ 48; *see also id.* ¶¶ 45-47.  In support, Plaintiffs reference four excerpts from Defendant's general ledger for the years 2008 through 2011.  *Id.*  Defendant's "General Ledger For the Period From Jan 1, 2008 to Dec 31, 2008" indicates that while Defendant paid $430,590.00 to procure workers compensation insurance for Plaintiffs, Defendant deducted $687,286.72 from Plaintiffs' settlements – approximately 159.62% of the cost of procuring the insurance.  D.E. 281-1, Ex. 21 at 1.  Defendant's "General Ledger For the Period From Jan 1, 2009 to Dec 31, 2009" indicates that Defendant paid $327,828.00 to procure workers compensation insurance for Plaintiffs but deducted $425,765.56 from Plaintiffs' settlements – approximately 129.87% of the cost of procuring the insurance.  *Id.* at 2.  Defendant's "General Ledger For the Period From Jan 1, 2010

---

[7] Plaintiffs do not appear to be claiming that Defendant also breached this provision of the Lease when it did not agree to the rate and schedule of payments with Plaintiffs.

to Dec 31, 2010" indicates that while Defendant paid $378,116.04 to procure workers compensation insurance for Plaintiffs, Defendant deducted $467,495.82 from Plaintiffs' settlements – approximately 123.64% of the cost of procuring the insurance.  *Id*. at 3.  Defendant's "General Ledger For the Period From Jan 1, 2011 to Dec 31, 2011" indicates that Defendant paid $501,824.50 to procure workers compensation insurance for Plaintiffs but deducted $582,030.14 from Plaintiffs' settlements – approximately 115.98% of the cost of procuring the insurance.  *Id*. at 4.

Defendant admits that (a) it "arranged to offer workers' compensation coverage to drivers through a group policy which Ironbound procured," Def. RSOMF ¶ 45; (b) "[a]ll drivers elected to use that group policy," *id*.; (c) it "deducted a set percentage from each driver's weekly compensation to pay for the premiums," *id*.; and (d) "the aggregate deductions from the drivers' pay exceeded the amount Ironbound advanced for the premiums from 2007 to 2011."  *Id*.  Thus, Defendant acknowledges that it overcharged Plaintiffs in 2007 as well.

Accordingly, the Court finds that there is no genuine dispute of material fact that Defendant charged the drivers more for workers' compensation insurance than it cost Defendant to procure the coverage.  As a result, Plaintiffs are entitled to summary judgment that Defendant breached Paragraph 17(b) of the Lease.  However, because there are genuine disputes of material fact as to the amount of damages, *see* Def. RSOMF ¶ 45, summary judgment is not granted as to the amount of damages caused by the breach.

### B.  Plaintiffs' Claims Under the Regulations

Both parties seek summary judgment as to Plaintiffs' claims under the Regulations. Plaintiffs allege five violations of the Regulations, 49 C.F.R. § 376 *et seq*.  The Regulations were promulgated under the Motor Carrier Act, 49 U.S.C. § 1401 *et seq*.  Under the act, "Congress

regulates leases between independent truckers and federally regulated motor carriers." *Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1211 (10th Cir. 2016). "Congress has tasked the Department of Transportation ("DOT") with further regulating these leases" and "the DOT does so through its Federal Motor Carrier Safety Administration and its [T]ruth-in-[L]easing regulations, 49 C.F.R. [§] 376." *Id.* (citing *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co.*, 632 F.3d 1111, 1113 (9th Cir. 2011)).

The purpose of the Regulations is to "protect independent truckers from motor carriers' abusive leasing practices." *Id.* (citing *Owner-Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank*, 636 F.3d 781, 795 (6th Cir. 2011)). Thus, the regulations seek

> to promote truth-in-leasing—a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; . . . to eliminate or reduce opportunities for skimming and other illegal or inequitable practices by motor carriers; and . . . to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry.

*Id.* (citing *Comerica Bank*, 636 F.3d at 795). The Regulations achieve this goal by "requiring, among other things, that the leases be in writing and specify their duration and the compensation that the carrier will pay the trucker." *Id.* The Motor Carrier Act also provides for a private right of action for enforcement of the Regulations, including declaratory and injunctive relief under 49 U.S.C. § 14704(a)(1), monetary damages under § 14704(a)(2), and attorneys' fees under § 14704(e). *Owner-Operator Indep. Drivers Assoc., Inc. v. C.R. England, Inc.*, 508 F. Supp. 2d 972, 983-84 (D. Utah 2007).

Section 376.12(a) of the Regulations states that "[t]he lease shall be made between the authorized carrier and the owner of the equipment." 49 C.F.R. § 376.12(a). In Count Two, Plaintiffs claim that the Lease violates 49 C.F.R. § 376.12(d). Section 376.12(d) requires the

authorized carrier to specify in the lease the amount it will compensate the owner, providing as follows:

> Compensation to be specified. The amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease. Such lease or addendum shall be delivered to the lessor prior to the commencement of any trip in the service of the authorized carrier. An authorized representative of the lessor may accept these documents. The amount to be paid may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease. The compensation stated on the lease or in the attached addendum may apply to equipment and driver's services either separately or as a combined amount.

49 C.F.R. § 376.12(d).  Plaintiffs allege that Paragraph 2 of the Lease does not comply with this provision, *see* Lease ¶ 2, because compensation is not "clearly stated" on the face of the Lease or in an attached addendum.  TAC ¶ 67.

In Count Three, Plaintiffs claim that the Lease violates 49 C.F.R. § 376.12(g). Section 376.12(g) requires the authorized carrier to provide sufficient documentation related to compensation, stating as follows:

> Copies of freight bill or other form of freight documentation. When a lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the authorized carrier will give the lessor, before or at the time of settlement, a copy of the rated freight bill, or, in the case of contract carriers, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. Regardless of the method of compensation, the lease must permit lessor to examine copies of the carrier's tariff or, in the case of contract carriers, other documents from which rates and charges are computed, provided that where rates and charges are computed from a contract of a contract carrier, only those portions of the contract containing the same information that would appear on a rated freight bill need be disclosed. The authorized carrier may delete the names

> of shippers and consignees shown on the freight bill or other form
> of documentation.

§ 376.12(g).  Plaintiffs allege that Defendant either refuses to allow them to examine documents

setting forth rates and charges paid by the shipping company or, when Defendant allows Plaintiffs

to view the documents, the rates and charges are redacted.  TAC ¶ 75.  Defendant responds that it

keeps its work orders and other documents confidential because they "contain information

enabling the driver or end recipient to determine the steamship company's and Ironbound's profit

margins."  Def. SOMF ¶ 29.  Defendant further contends it was not necessary for the Lease to

require disclosure of such information because Defendant did not pay drivers on the basis of its

revenue per trip.  Def. Br. at 18; *compare* Lease ¶ 2 (specifying payment to made on a "per-trip

basis") *with* 49 C.F.R. § 376.12(g).

  In Count Four, Plaintiffs claim that the Lease violates 49 C.F.R. § 376.12(h).  Section

376.12(h) specifies requirements for charge-back items, stating the following:

> Charge-back items. The lease shall clearly specify all items that may
> be initially paid for by the authorized carrier, but ultimately
> deducted from the lessor's compensation at the time of payment or
> settlement, together with a recitation as to how the amount of each
> item is to be computed. The lessor shall be afforded copies of those
> documents which are necessary to determine the validity of the
> charge.

49 C.F.R. § 376.12(h).  Plaintiffs allege that although the Lease lists a number of permissible

chargeback items, the Lease fails to recite any manner in which these amounts are to be computed.

TAC ¶ 82.  Plaintiffs also allege that Defendant does not provide supporting documentation or

written explanation for charges it deducts from Plaintiffs' paychecks and escrow accounts for

property damage.  *Id.* ¶¶ 85, 95.

  In Count Five, Plaintiffs claim that the Lease violates 49 C.F.R. § 376.12(i).  Section

376.12(i) provides that a "lease shall specify that the lessor is not required to purchase or rent any

products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement." § 376.12(i).  While the Lease contains the required language,[8] Plaintiffs contend that they were in fact required to rent parking spaces from Defendant.  TAC ¶¶ 90, 91; *see also* D.E. 177-4, D.E. 177-5, D.E. 177-6, D.E. 177-7, D.E. 177-8 (certifications of named Plaintiffs).  Defendant claims that drivers were not obligated to park at their lot but could choose to do so and that its parking rates were cheaper than competitors.  Def. SOMF ¶ 93.

Finally, under Count Six, Plaintiffs claim that the Lease violates 49 C.F.R. § 376.12(j)(3), requires the following:

> The lease shall clearly specify the conditions under which deductions for cargo or property damage may be made from the lessor's settlements. The lease shall further specify that the authorized carrier must provide the lessor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to the lessor. The written explanation and itemization must be delivered to the lessor before any deductions are made.

49 C.F.R. § 376.12(j)(3).

Defendant first argues that summary judgment is warranted because Plaintiffs suffered no damages as a result of any alleged deficiencies in the Lease.  Def. Br. at 14.  Defendant next argues that the Lease complies with the Regulations' specifications concerning compensation, because the trip sheets signed between Defendant and the drivers adequately specify compensation.  *Id*. at 17.  Defendant also argues that it could not have violated Section 376.12(g) of the Regulations because Defendant did not compensate the drivers using a percentage of gross revenue.  *Id*. at 18. Defendant further argues that the Lease complied with Sections 376.12(h) and 376.12(j)(3) of the

---

[8] Plaintiffs argue that this provision was not in the Lease, but the Lease clearly contains it.  *See* Lease ¶ 15 ("Lessee agrees Lessor is not required to purchase or rent any products, equipment, or services from Lessor's as a condition of entering into this Lease."); Def. SOMF ¶ 17.

Regulations and that it has created a new Lease that moots Plaintiffs' claims for injunctive relief. *Id*. at 19-21. On the other hand, Plaintiffs claim they are entitled to summary judgment on several of their claims under the Regulations and further request the Court to issue an injunction that Defendant, among other things, comply with the Regulations. *Id*. The Court addresses each of the parties' arguments in turn.

### 1. Defendant's Motion for Summary Judgment as to Damages

Defendant argues that even if the Lease does violate the Regulations, Plaintiffs have not suffered any damages as a result. D.E. 282-1 at 15. Defendant argues that to establish liability under the Regulations, a plaintiff must not only show a violation but also that the violation caused the plaintiff actual harm. D.E. 282-1 at 14-16. Plaintiffs do not appear to contest that they must prove damages. *See generally* D.E. 297 at 32-38 (arguing "Ironbound's violation of the Regulations damages Plaintiffs in numerous ways.").

Although Plaintiffs do not apparently contest the issue, the Court nevertheless reviews the relevant authority. While the Third Circuit has not addressed this issue, other courts have found that under the Regulations, a "plaintiff must not only show a violation but also that the violation caused the plaintiff damages." *Carlisle v. Elite Trucking Servs., LLC*, No. 16-257, 2017 WL 3653800, at *4 n. 1 (S.D. Miss. July 6, 2017) (collecting cases). A plaintiff "must do more than point out that a lease has missing or contradictory provision . . . evidence of actual damages is required." *Id*.

In *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, 632 F.3d 1111 (9th Cir. 2011), the Ninth Circuit reviewed a district court's grant of summary judgment which found no liability under the Regulations because the plaintiff "had failed to demonstrate 'actual damages.'" *Id*. at 1121-1122. The Ninth Circuit found that the "district court's conclusion

regarding the standard for proving damages comports with the statutory text and case law on this question." *Id.* at 1122.  The *Swift* court reasoned that the text of 49 U.S.C. §14704(a)(2), which provides, in part, that "a carrier . . . is liable for *damages* sustained . . . *as a result of* an act or omission . . . in violation of this part," compelled the conclusion that actual damages are required under the statute.  *Id.* (emphasis in original).  The *Swift* court further noted that "[e]ach court that has addressed the issue . . . has agreed that [49 U.S.C. §14704(a)(2)] requires proof of actual damages."  *Id.* (collecting cases).

The Eleventh Circuit reached a similar conclusion in *Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1325 (11th Cir. 2010).  In *Landstar*, the owner-operator plaintiffs brought suit against defendant, alleging that the relevant leases violated 49 U.S.C. § 376.12(d) and (h).  *Id.* at 1312.   The district court granted the defendant judgment as a matter of law as to damages, finding that plaintiffs "failed as a matter of law to establish damages sustained as a result of" the defendants' violation of the regulations.  *Id.*  The Eleventh Circuit affirmed the district court's ruling that the plaintiffs were required to prove actual damages based on the "plain language of the statute."  *Id.* at 1325.

Here, Defendant references paragraphs 76 and 93 of its statement of undisputed material facts in support of its arguments that Plaintiffs have not sustained actual damages under the Regulations.  Paragraph 76 refers to Defendant's procurement of workers compensation insurance for Plaintiffs: "Ironbound's subsidy to the drivers brought their annual premium payments far below $7,000."  Def. SOMF ¶ 76.  Paragraph 93 provides as follows: "Though not obligated to do so, a driver could voluntarily chose [*sic*] to park in Ironbound's lot.  Ironbound's parking fees were lower than competitors' rates and were deducted from driver pay consistent with the language of the Lease Agreement which allows for Ironbound to deduct operating and maintenance expenses."

27

*Id* ¶ 93.

The Court disagrees with Defendant's damages argument. As discussed above, it is undisputed that Defendant overcharged Plaintiffs from 2008 to 2011 for workers' compensation insurance. Defendant appears to assert that Plaintiffs nevertheless would have paid more for insurance if they bought it on the open market. Def. SOMF ¶ 75. This may be accurate, but Defendant provides no legal authority as to why this should act as a damages offset. The Lease clearly states that Plaintiffs would pay the "cost" of the insurance. Lease ¶ 17.

As to parking costs, Defendant has not established that competing parking lots cost more than Defendant's prices. Defendant relies on the testimony of several of its employees, but none testified as to the comparative costs to park. Instead, each claimed that Plaintiffs were not required to use Defendant's lot. Pizzuto indicated that Plaintiffs were not required to park their cars at Defendant's lot. D.E. 282-4, Ex. 1 at 129: 1-9. Krawiec indicated that "the drivers parking on our property was their decision to park." D.E. 282-6, Ex. 7 at 82:18-23. Similarly, Lastra did not testify as to the price that Defendant charged Plaintiffs to park at its lot nor to the price of competitors. D.E. 282-6, Ex. 9 at 60:5-18. Garcia did not testify about the cost of parking at Defendant's lot versus others. D.E. 282-4, Ex. 2, 75:24-77:25; *see also id*. 251:20 to 252:18. And Plaintiff Fontin testified as to the rates that he paid at Defendant's lot but not as to other competing rates. D.E. 282-6, Ex. 8 at 135:10 to 136:3. One Plaintiff, Bonhomme, testified that Defendant's lot was the "cheapest" but this testimony on its own cannot establish as undisputed that it costs less to park in Defendant's lots than others. *See* D.E. 282-5, Ex. 4 at 205:11-13. In sum, Defendant has not established an absence of a genuine issue of material fact as to damages on the issue of parking fees and workers' compensation insurance.

## 2.  Defendant's Motion for Summary Judgment as to Count Two

Defendant moves for summary judgment as to Count Two of the TAC.  Defendant contends that the trip sheets it issued and oral communications exchanged with Plaintiffs satisfied the compensation disclosure requirements of Section 376.12(d).  Defendant relies heavily on *Port Drivers Federation 18, Inc. v. All Saints Express, Inc.*, 757 F. Supp. 2d 463 (D.N.J. 2011).  However, that case is distinguishable.  In *Port Drivers*, the court refused to hold the defendant, an authorized carrier, in contempt of a previous injunction which ordered the reformation of the defendant's compensation disclosure practices to its drivers.  *Id.* at 469.  In *Port Drivers*, to comply with the court's injunction, the defendant attached a "Schedule C" to the leases between it and its drivers to establish compensation.  *Id.*  The schedule listed "local delivery destinations and/or pick up locations with round trip fixed fees for pick up/delivery at over 400 locations in compliance with the Regulations."  *Id.*  In addition, the schedule established a procedure for compensation for trips to delivery points not covered under schedule.  *Id.*  This procedure required compensation to be communicated either "orally (including by phone), electronically, or hard copy form" at the time the move.  *Id.*  The schedule further provided the following:

> If Contractor decides to accept the move at the rate offered, Contractor shall evidence his/her agreement to do so either by thereupon performing the move and signing the delivery receipt, which shall state the rate for the move and be signed by an ASE representative also, or by communicating via an electronic device. The completed signed delivery receipt shall constitute an addendum to this contract.

*Id.*  The plaintiffs contended that "any consent that may be obtained either by an electronic device or by phone would violate the regulations."  *Id.*  The defendant countered that this procedure was necessary to address "job opportunities [not] . . . anticipated by the lease."  *Id.*  The *Port Drivers* court agreed with the defendant.  *Id.*  The court reasoned that the provision in the schedule requires an accepting driver to "be provided with a clear statement of how much he will make during the

trip, and the delivery receipt will contain the signature of both a [carrier] representative and the contractor." *Id*. The court therefore concluded that the schedule provided "the contractor with all information that is required by the regulations." *Id*.

Unlike in *Port Drivers,* here, there is no schedule setting forth rates attached to the Lease – the parties do not dispute that a Schedule B was never attached to the Lease. Def. RSOMF ¶ 23. Moreover, the schedule in *Port Drivers*, provided "round trip fixed fees" for the usual and contemplated business of the defendant carrier. A fixed fee clearly complies with 49 C.F.R. § 376.12(d). Finally, the court in *Port Drivers* found that the provision in Schedule C, which permitted *ad hoc* agreements for the "few trips" that could not be anticipated by the lease, provided the driver with information required by the Regulations. *Port Drivers,* 757 F. Supp. 2d at 469. Notably, the *Port Drivers* court cited no authority to support this conclusion. *Port Drivers* is not binding precedent, and this Court questions whether this finding was actually supported by the Regulations. In any event, all reasonably contemplated trips in *Port Drivers* were subject to an express fixed fee, and the court permitted individual agreements for the few trips that the carrier could not reasonably anticipate. In comparison, the Lease here does not specify any method of compensation whatsoever. And although Defendant claims that the trip sheets signed by the drivers constituted Schedule B, the Court has already rejected this argument. Here, it is undisputed that the Lease itself does not specify compensation, that there was no Schedule B attached to the Lease, the trip sheets were not labeled Schedule B, and the trip sheets were not attached to the Lease. As the Court noted in its Class Certification Opinion, Defendant's use of the trip sheets – which based driver compensation on variables and factors that were not shared with the drivers – is the type of activity that the Regulations are designed to avoid. Class Cert. Op. at 18.

Similarly, *Strickland v. Truckers Express, Inc.*, 2003 U.S. Dist. LEXIS 27385, (D. Mont.

2003) is inapposite.  In that case, the court concluded that "[d]efendant had violated § 376.12(d)" because the "lease does not clearly state the amount of Plaintiffs' compensation."  *Id*. at *11. However, the court ultimately refused to find against the defendant because it adopted a "substantial compliance" view in interpreting the Regulations and found "there *is no evidence of any injury to Plaintiffs* as a result of the failure of the leases to clearly state in writing the amount of Plaintiffs' compensation." *Id*. at *20 (emphasis added).  Here, the Court declines to adopt the relaxed standard from *Strickland* because "requiring only substantial compliance might defeat the Regulations' goal of preventing large carriers from taking advantage of owner-operators due to uneven bargaining power."  *Port Drivers Fed'n 18, Inc.*, 757 F. Supp. 2d at 451; *see also Cunningham*, 662 F.Supp.2d at 1271 (finding that lower court decisions adopting the substantial compliance standard "relied in part on a decision that the Ninth Circuit has since vacated."). Moreover, it appears the *Strickland* court's decision was primarily motivated by its prior determination that the plaintiffs had not suffered actual damages. *See Strickland*, 2003 U.S. Dist. LEXIS 27385 at *20 ("[T]here is no evidence of any injury to Plaintiffs as a result of the failure of the leases to clearly state in writing the amount of Plaintiffs' compensation . . . . Absent any harm to Plaintiffs the Court concludes that Defendant is not liable for a breach of § 376.12(d).").  As noted above, Plaintiffs must prove actual damages.  The Court denies Defendant's motion for summary judgment as to Count Two of the TAC.

### 3.   Defendant's Motion for Summary Judgment as to Count Three

Defendant moves for summary judgment as to Count Three of the TAC.  Def. Br. at 18. Defendant contends it was not obligated to provide the documentation specified under 49 C.F.R. § 376.12(g) because it did not compensate drivers based on revenue. *Id*. at 18-19.

There are two problems with Defendant's argument.  First, at least certain named Plaintiffs

clearly indicate that they were to be paid based on revenue, that is, the 70/30 split.  Second, Section

376.12(g) also provides in relevant part that

> *Regardless of the method of compensation*, *the lease must permit* lessor to examine copies of the carrier's tariff or, in the case of contract carriers, other documents from which rates and charges are computed, provided that where rates and charges are computed from a contract of a contract carrier, only those portions of the contract containing the same information that would appear on a rated freight bill need be disclosed. The authorized carrier may delete the names of shippers and consignees shown on the freight bill or other form of documentation.

49 C.F.R. § 376.12(g) (emphasis added). The Lease does not contain the required language.

Defendant's motion for summary judgment as to Count Three is denied.

### 4. The Parties' Motions for Summary Judgment as to Count Four vis-à-vis Worker's Compensation Insurance

The Court has already determined that Plaintiffs are entitled to summary judgment as to

Defendant's breach of the Lease for overcharging Plaintiffs for worker's compensation insurance.

Plaintiffs, however, further contend that the workers' compensation provision also violates the

Regulations.  In other words, the remaining issue for summary judgment as to that claim is whether

there is a genuine dispute of material fact that the workers' compensation provision of the Lease

fails to conform to the Regulations.  Defendant, on the other hand, submits that it is entitled to

summary judgment on the issue.  Paragraph 17 of the Lease states as follows:

> [Driver] agrees to procure and pay the full expense of . . . Worker's Compensation insurance . . . . In the event [driver] is unable to obtain suitable Worker's Compensation insurance, [driver] hereby authorizes [Defendant] to procure and pay for such insurance as [driver]'s agent, and to charge back the cost of such insurance against any settlements due [driver] hereunder at a rate and on a schedule to be agreed upon between [Defendant] and [driver]. [Defendant] shall provide [driver] with a Certificate of Insurance for any policy of Worker's Compensation insurance which it may purchase on [driver]'s behalf which shall specify the name of the insurer, the policy number, the effective dates of the policy, the

> amounts and types of coverage, and the deductible amounts for
> which [driver] may be liable under each type of coverage. Upon
> request, [Defendant] shall supply [driver] with a copy of any such
> policy which it may purchase on [driver]'s behalf.

Lease ¶ 17.

Paragraph 17 adequately specifies the item that will be paid for and ultimately deducted

from the drivers' settlements: workers' compensation insurance. The paragraph further specifies

that the drivers will be provided with a certificate of insurance containing the pertinent information

(the identity of the insurer, the dates of the policy, the amount of coverage, and the deductible

amounts). And if the driver requests a copy of the policy, he or she will be provided with it.

Accordingly, even if Section 376.12(h) required leases between authorized carriers and drivers to

contain a provision that a driver be "afforded copies of those documents which are necessary to

determine the validity of the charge,"[9] Paragraph 17 of the Lease complies with the requirement.

Paragraph 17 also appropriately indicates that Defendant would "charge back the cost of such

insurance against any settlements due [driver] hereunder at a rate and on a schedule" agreed to by

the parties. 49 C.F.R. § 376.12(h); s*ee also Port Drivers*, 757 F. Supp. 2d at 468. In short, the

workers' compensation provision of the Lease complies with Section 376.12(h); there is no

genuine dispute of material fact as to this issue. The fact that Defendant did not comply with

Paragraph 17 by overcharging Plaintiffs means that Defendant breached the Lease not that the

language of the Lease does not comply with the Regulations. Accordingly, Plaintiffs' motion for

summary judgment as to Count Four vis-a-vis workers' compensation insurance is denied, and

---

[9] Certain courts have concluded that such language is not required. *See, e.g.*, *Port Drivers Fed'n 18, Inc.,* 757 F. Supp. 2d at 468 ("[P]laintiffs argue that the lease violates § 376.12(h) because it fails to state that the contractors 'shall be afforded copies of those documents which are necessary to determine the validity of the charge.'. . . Section 376.12(h) does not require that the lease state that these documents will be provided to the lessors; it only requires that the lessors receive such documents.")

Defendant's motion for summary judgment on the issue is granted.

### 5. The Parties' Motions for Summary Judgment as to Remaining Claims in Count Four

Defendant also moves for summary judgment on the remaining bases for Count Four, arguing that Paragraphs 18 and 20 of the Lease comply with the chargeback provisions of Section 376.12(h).  Defendant contends the Lease complies with that section because the language of the Lease in conjunction with the written explanations and itemizations for the chargebacks adequately apprise the drivers of the nature and computation of the chargebacks.  Def. Br. at 19-20.  Plaintiff moves for summary judgment that Paragraph 18 of the Lease violates Section 376.12(h), Pl. Br. at 25-29.

Paragraph 18 of the Lease requires a "Driver Deposit Fund," whereby Defendant "shall maintain an escrow fund throughout the term of this Lease to be used for the adjustment of claims between the parties to this Lease."  Lease ¶ 18.  Under Paragraph 18, Plaintiffs agreed "to pay the sum of $1000.00 into the fund and to replenish the fund as necessary throughout the term of this Lease to maintain it at a minimum level of $1000.00 at all times."  *Id.*  The Lease further provides that Defendant

> may charge the escrow fund the actual amount up to $1000.00 for any and each of the following losses occasioned by the [driver]'s negligence or maintenance: (1) loss of freight charges, (2) damage to cargo, (3) damage to property by the [driver], (4) damage to other property for which the [Defendant] may be held liable, and (5) uprighting and towing.  In the event such losses exceed $1000.00 or the monies available in the escrow fund, [Defendant] may withhold from any settlements due the [driver] sufficient sums to cover its expenditures, losses, or liabilities in connection with such losses.  Whenever such a charge or withholding is being made, the [Defendant] will provide the [driver] with a written explanation therefore.

*Id.*

In relevant part, Paragraph 20 of the Lease provides:

> In addition to the charge back or withholding authority granted by Lessor to Lessee elsewhere in this Lease, Lessor agrees that Lessee shall have the right to charge against any settlement owed Lessee under this Lease amounts sufficient to reimburse Lessee for the following items of expense which Lessee may incur by or on behalf of Lessor or by reason of Lessor's performance hereunder:
>
> (a) any tax or cost of operating or maintaining the leased equipment including all expenses specified in Section 6 hereof and any cost of releasing the lease equipment or its cargo except as is otherwise made the obligation of Lessee in this Lease.
>
> (b) any fines or penalties imposed upon Lessee as a result of violations by Lessor, or any of its agents, servants or employees of any I.C.C. or D.O.T. rule or regulation or of any other law, regulation or ordinance of any federal, state or municipal Authority having jurisdiction.
>
> (c) any losses or expenses incurred by Lessee as a result of the failure of Lessor, or any of its agents, servants or employees to remit to Lessee any monies collected on behalf of Lessee.
>
> (d) any losses or expenses incurred by Lessee as a result of its inability to collect freight charges earned due to Lessee's failure to properly complete and submit the paperwork and documents set forth in Section 7 hereof.
>
> (e) any loss of or damage to property or cargo or any other losses or expenses which Lessee may incur or for which it may be held liable as a result of Lessor's conduct hereunder.  Prior to effecting any withholding against Lessor for such losses, expenses or liabilities, Lessee shall provide Lessor with a written explanation and itemization of the withholding to be made.

Lease ¶ 20; Pl. SOMF ¶ 27; Def. RSOMF ¶ 27.

Defendant further asserts that any amounts deducted from Plaintiffs' settlements or escrows "were plainly stated on their weekly check stubs or invoices and could have been challenged at any time."  Def. RSOMF ¶ 94.  In support of this statement, Defendant relies on the testimony of Pizzuto.  *Id*.  Pizzuto testified that any documents "pertaining to the final settlement"

were accessible on an application Defendant used called "Profit Tools." D.E. 282-4, Ex. 1 at 62:1-24. According to Pizzuto, "Profit Tools . . . records all the movement of the trucks and the drivers and creates some reports within that to [*sic*] help us pull the payroll information or settlement information." *Id*. Pizzuto further testified that if a driver had an issue with their compensation, the company could use Profit Tools to pull up the paperwork related to a trip which would include the work order and bill of lading. *Id*. Pizzuto added that if a driver damaged a chassis while delivering a load, Defendant would not deduct money from the driver's escrow unless the driver was no longer working with Defendant; otherwise, Defendant would take the funds with the driver's permission. *Id*. at 131: 9-18.

> Pizzuto also testified as follows:
>
> Q. Did the drivers from time to time come to you to request any backup documentation concerning chargebacks under the escrow arrangement?
>
> A. Did they come to me? I . . . Don't think anybody came to me. But anything that was charged back at the time of their settlement they were provided with copies of.
>
> Q. Okay. But you don't have a recollection of someone coming to you to say I'd like to see the backup?
>
> A. Maybe in my early years somebody may have came to me in the main office. But we would send them back to dispatch because we didn't get involved in that.

*Id*. The Court notes that this last statement is the only referenced testimony by Pizzuto that supports Defendant's factual assertion that Plaintiffs' settlements or escrows "were plainly stated on their weekly check stubs or invoices and could have been challenged at any time." Def. SOMF ¶ 94. And the testimony reflects her limited involvement with chargeback disputes. D.E. 282-4, Ex. 1 at 145:3-9.

> Defendant also refers to Plaintiff Luxama's testimony. Luxama testified as to Defendant's

36

procedure for chargebacks.  D.E. 282-5, Ex. 3 at 112:1-114:25.  Mr. Luxama indicated that the cost and reason for any chargeback was provided "in the pay stub" for a given settlement and that drivers would generally be able to challenge a chargeback with Defendant.  *Id*. at 113:2-15.

In opposition, Plaintiffs point to the following testimony of Plaintiff Bonhomme:

> Q.  So you said there was a statement that was attached to your pay stub.  The statement attached to your pay stub, what would it say?  Would it say the price you received for each trip and all the deductions that were made from your pay?
>
> A. Yes.
>
> Q.  If there was a repair made, would they include the invoice for the repair on the pay stub?
>
> A. No, we don't have to repair because we don't got the repair because everything is on us.  It's only thing if they take the money from you, let's say you have a flat tire in the road, they fix it, if they deduct the money from you get paid they just say minus tire and they just take it.
>
> Q. It will say "minus tire" and the amount?
>
> A. Yea, they take it.
>
> Q. What about, for example, for the door you said that was damaged, did they provide you with the invoice for the door?
>
> A. No, I only got my check come in they [*sic*] deductible $2,900, that's all.
>
> Q. And it said for the door?
>
> A. When I go crazy with Chris, I said, "You know how many night I spend to get that? I need that money." He said, "Go see Danny." When I go see Danny, he don't know, but he get his phone, he make a telephone call, somebody go over the paperwork and he tell me that was for the door damage. And I said, "Danny, listen, why I have insurance? I have deductible. My deductible is $1,000. Why I gotta pay 29?" And then I don't remember exactly what he tell me.

D.E. 297-3, Ex. 1 at 159:22-161:5; Pl. RSOMF ¶ 94.

As with Pizzuto and Luxama, Bonhomme testified that any "amounts" deducted from the Plaintiffs' payments or escrows were either stated on the drivers pay stubs or on an invoice. *Id*. Plaintiff Bonhomme also testified as to his ability to contest charges, albeit in that instance to an inconclusive result. *Id.*

Accordingly, the Court finds that there is no genuine dispute of material fact and that the "amounts deducted from the Plaintiffs' payments or escrows for [chargebacks], if any, were plainly stated on their weekly check stubs or invoices and could have been challenged by Plaintiffs at any time." Def. SOMF ¶ 94.

Defendant contends that the Lease language coupled with the invoices and pay stubs, which documented chargebacks, complied with 49 C.F.R. § 376.12(h).  Def. Br. at 20; Def. Opp. at 27 (citing *Landstar*, 622 F.3d at 1319; *Swift Transp.,* 632 F.3d at 1120).  As to Paragraph 18 of the Lease, the Court agrees.  That paragraph spells out specifically which losses may be charged back against an escrow account: "(1) loss of freight charges, (2) damage to cargo, (3) damage to property by the [driver], (4) damage to other property for which the [Defendant] may be held liable, and (5) uprighting and towing." Lease ¶ 18.  Paragraph 18 also specifies "how the amount of each item is to be computed," indicating that chargebacks would be for the "actual amount up to $1000.00" for any of the specified losses. *Id*.  Finally, there is no genuine dispute of material fact that Defendant complied with Section 376.12(h)'s documentation requirement.  *Compare* Def. SOMF ¶ 94 *with* 49 C.F.R. § 376.12(h) ("[T]he lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge.").  Defendant is entitled to summary judgment that Paragraph 18 of the Lease complies with 49 C.F.R. § 376.12(h) and Plaintiffs' motion for summary judgment as to Paragraph 18 is denied.

However, Defendant's arguments as to Paragraph 20 of the Lease ignores a key

requirement of Section 376.12(h), specifically that "[t]he lease shall clearly specify all items that may be initially paid for by the authorized carrier." 49 C.F.R. § 376.12(h).  The portion of *Landstar* that Defendant relies on addressed only whether the settlements provided to the plaintiffs satisfied section 376.12(h)'s requirement that a driver "shall be afforded copies of those documents which are necessary to determine the validity of the charge." *Landstar*, 622 F.3d at 1320 ("The issue before us, therefore, is whether the settlement statements satisfied Landstar's obligation to disclose the manner in which it computed flat-fee charge-backs.").  The portion of *Swift* Defendant relies on also dealt with Section 376.12(h)'s documentation requirement. *Swift*, 632 F.3d at 1120.

Nevertheless, as the *Landstar* court acknowledged, Section 376.12(h) imposes an additional requirement: "[T]he motor carrier shall 'clearly specify' . . . 'all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessors' compensation at the time of payment or settlement[.]" *Landstar*, 622 F.3d at 1320.  As to Paragraph 20, Defendant does not address the specificity requirement.

There is no genuine dispute of material fact that Paragraph 20 of the Lease fails to meet the specificity requirement.   In addition to listing specific items which may be charged back, Paragraph 20(e) lists a catchall for "any other losses or expenses which Lessee may incur or for which it may be held liable as a result of Lessor's conduct hereunder." *See* Lease ¶ 20; Pl. SOMF ¶ 27; Def. RSOMF ¶ 27.  Like the "necessary operation expenses" provision that the court in *Brinker v. Namcheck*, 577 F. Supp. 2d 1052, 1061 (W.D. Wis. 2008) (cited by Defendant) rejected as too unspecific, the catchall provision in Paragraph 20(e) fails to adequately specify all potential chargebacks.  Defendant's motion for summary judgment that Paragraph 20 of the Lease complies with 49 C.F.R. § 376.12(h) is denied.

**6.   The Parties' Motions for Summary Judgment as to Count Six**

Defendant moves for summary judgment that Paragraph 20(e) of the Lease complies with 49 C.F.R. § 376.12(j)(3) because it specifies deductions for cargo and property damage and provides for a written explanation or itemization for such deductions.  Def. Br. at 21.  Plaintiffs move for summary judgment as to this Count as well.  Pl. Br. at 33.

Although the TAC clearly states a claim under 49 C.F.R. § 376.12(j)(3), *see* TAC ¶ 93 (quoting 49 C.F.R. § 376.12(j)(3)), Plaintiffs focus their opposition on 49 C.F.R. § 376.12(j)(2).  Pl. Opp. at 33 ("Section 376.12(j)(2) requires that 'if' a carrier 'make[s] a charge back . . . for any' insurance, the lease 'specify *the amount* which will be charged back' and that 'a copy of each policy' will 'provide[d]' 'upon' driver's request.").  Plaintiffs' affirmative summary judgment brief as to this Count focuses on Section 376.12(j)(3).  Because Count Six of the TAC states a claim under Section 376.12(j)(3) and because Defendant's briefing focuses on that provision, the Court only evaluates Paragraph 20(e)'s compliance with Section 376.12(j)(3), not Section 376.12(j)(2).

Section 376.12(j)(3) requires the following:

> The lease shall clearly specify the conditions under which deductions for cargo or property damage may be made from the lessor's settlements. The lease shall further specify that the authorized carrier must provide the lessor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to the lessor. The written explanation and itemization must be delivered to the lessor before any deductions are made.

49 C.F.R. § 376.12(j)(3)

Paragraph 20 of the Lease specifies that Defendant may deduct from a driver's settlement an "amount[] sufficient to reimburse [Defendant] for the following . . . any loss of or damage to property or cargo . . . which Lessee may incur or for which it may be held liable as a result of

Lessor's conduct[.]"  Lease ¶ 20(e).  Thus, Paragraph 20(e) clearly specifies the conditions under which Defendant can deduct property and cargo damages from drivers' settlements.  Paragraph 20(e) also provides that Defendant "shall provide [driver] with a written explanation and itemization of the withholding made," Lease ¶ 20(e) as Section § 376.12(j)(3) requires.  As there is no genuine dispute of material fact, Defendant's motion for summary judgment that Paragraph 20(e) of the Lease complies with 49 C.F.R. § 376.12(j)(3) is granted, and Plaintiffs' motion for summary judgment as to this Count is denied.

### 7. The Remaining Sections of Plaintiffs' Motion for Summary Judgment

Plaintiffs also seek summary judgment for the following claims under the Regulations: (1) 49 C.F.R. § 376.12(d) (alleging the Lease fails to specify compensation), TAC ¶¶ 56-71; (2) 49 C.F.R. § 376.12(g) (alleging the Lease fails to permit Plaintiffs to examine documents pertaining to compensation), *id.* ¶¶ 72-79; (3) 49 C.F.R. § 375.12(h) (alleging Paragraph 20 of the Lease does not contain adequate provisions addressing chargebacks), *id.* ¶¶ 80-87.  As to these claims, Plaintiffs have failed to establish the absence of a genuine dispute of material fact establishing the injury that the alleged regulatory violations caused them.  As discussed, injury is a necessary element in proving liability under the Regulations.  *See Landstar Sys., Inc.*, 622 F.3d at 1325; *Swift Transp. Co. (AZ)*, 632 F.3d at 1121-1122; *New Prime, Inc.*, 339 F.3d at 1012.

Plaintiffs seek summary judgment under Count Two, alleging a violation of 49 C.F.R. § 376.12(d).  Although the Court found above that the Lease lacked the requisite language, Plaintiffs must still establish the fact of injury is undisputed to be entitled to summary judgment under Count Two.  *Cunningham v. Lund Trucking Co.*, 662 F. Supp. 2d 1262, 1272 (D. Or. 2009) ("A violation of 49 C.F.R. § 376.12 does not suffice for a finding of liability, however.  The plaintiffs must also prove the violation caused an injury.").  Although Plaintiffs claim they were underpaid for

Defendant's failure to adhere to the 70/30 split, as set forth above, Plaintiffs failed to establish as undisputed that the 70/30 split was agreed to.  In fact, the Court previously denied class treatment as to such claims.  Class Cert. Op. at 22-23.  To the extent Plaintiffs' claims for fuel surcharges and detention time also fall under this Count, the Court also previously denied class treatment as to fuel surcharges.  *Id.* at 23.  While the Court found class treatment appropriate as to detention time, *id.* at 23-24, Plaintiffs have not shown that there is an absence of a genuine dispute of material fact as to the extent of the injury across the class as a whole.  Thus, summary judgment is denied as to Count Two.

 The Court denies Plaintiffs' motion for summary judgment as to liability on Count Three, which asserts a claim under 49 C.F.R. § 376.12(g).  That section requires a lease to provide drivers with the right to examine documents related to their compensation.  *See* 49 C.F.R. § 376.12(g).  Again, Plaintiffs have not demonstrated the absence of a genuine dispute of material fact showing that they were injured by the Lease's failure to provide Plaintiffs with examination rights.  *See generally* Pl. SOMF.  Plaintiffs' motion for summary judgment as to liability on Count Three is denied.

Plaintiffs also seek summary judgment as to their claim under 49 C.F.R. § 376.12(h), which addresses chargebacks.  Pl. Br. at 25.  However, Plaintiffs' SOMF is devoid of any factual assertions concerning how improper chargebacks caused them injury.  *See generally* Pl. SOMF; *see also Cunningham,* 662 F. Supp. 2d at 1274 ("Plaintiffs, however, have failed to present evidence of how [carrier's] violation of 376.12(h) caused them any injury. They do not, for example, present evidence that [carrier] overcharged them for deductions or that they would have made other choices had they known how Lund Trucking computed the deductions.").  Accordingly, Plaintiffs' motion for summary judgment on this issue is denied.

### C. Plaintiffs' Motion for Declaratory Judgment

Plaintiffs request a declaratory judgment as to the aspects of the Lease that the Court has determined violate the Regulations.  Pl. Br. at 34.  Although Defendant contends that Plaintiffs' declaratory relief should be denied, Defendant does not advance arguments in opposition to declaratory relief and instead focuses on Plaintiffs' claims for injunctive relief.  *See generally* Def. Opp. at 34-37.  Plaintiffs maintain that the Court should determine whether the provisions of the Lease violate the Regulations without regard to liability.  Pl. Reply at 5 (citing *Cunningham*, 662 F.Supp.2d at 1271 ("A plaintiff may establish a Truth–in–Leasing violation when a defendant has failed to fully comply with a regulatory provision but cannot establish liability without proof that the violation caused injury.")).

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  *Port Drivers*, 757 F. Supp. 2d at 460 (quoting 28 U.S.C. § 2201).  "[T]here must be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.'"  *Id*. (quoting *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977)) (citation omitted).  Furthermore, declaratory relief is appropriate when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Id*. (quoting *Maryland Cas. Co. v. Pacific Coal & Oil, Co.*, 312 U.S. 270, 273 (1941)).

Here, there is clearly a substantial controversy as to whether the Lease complies with the Regulations, and there is sufficient immediacy here to issue a declaratory judgment.  Although the

parties do not dispute that Defendant has implemented a new lease ("New Lease"), Pl. RSOMF ¶ 115, which it represents complies with the Regulations, D.E. 287-7, ¶ 9, no court has adjudicated Defendant's assertion.  It is also not clear whether all of Defendant's drivers are subject to the New Lease.  *See Port Drivers*, 757 F. Supp. 2d at 460 ("There is an actual controversy concerning whether the leases entered into between plaintiffs and All Saints violate the Regulation. Because these leases are still in force, the case is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").  Accordingly, the Court reviews its decision above and sets forth below which provisions of the Lease violate the Regulations.

The Court grants Plaintiffs' request for declaratory judgment as to its claim under 49 C.F.R. 12(d).  As the Court determined above, the trip sheets do not constitute Schedule B to the Lease. And there is no dispute that compensation is not "clearly stated" on the Lease.  49 C.F.R. §376.12(d).  The Court likewise grants Plaintiffs' request for declaratory judgment as to its claim under 49 C.F.R. § 376.12(g).  As the Court determined above, "*[r]egardless of the method of compensation*," Section 376.12(g) required Defendant to specify in the Lease that drivers are permitted to "examine copies of the carrier's tariff or, in the case of contract carriers, other documents from which rates and charges are computed[.]"  49 C.F.R. § 376.12(g).  The Court similarly grants Plaintiffs' request for declaratory judgment as to its claim under 49 C.F.R. § 376.12(h).  As the Court determined above, Paragraph 20 of the Lease fails to meet the specificity requirement of Section 376.12(h).

The Court denies Plaintiffs' request for declaratory judgment as to its claim under 49 C.F.R. § 376.12(j)(3).  Plaintiffs contend that "nowhere does Ironbound 'clearly specify the conditions which deductions cargo or property damage may be made." Pl. Br. at 32-33.  However, as the Court determined, Paragraph 20(e) complies with Section 376.12(j)(3).

44

Finally, Plaintiffs seek a declaration[10] that Defendant violated the escrow requirements set forth in 49 C.F.R. § 376.12(k). This claim is not raised in Plaintiffs' TAC. Plaintiffs claim that their failure to include the claim was due to counsel's mistake. *Id*. Plaintiffs further argue that Defendant has been on notice by the pleadings and proofs that the Lease violates Section 376.12(k) such that the Court should enter an order conforming the pleadings to the proofs under Fed. R. Civ. P. 15(b)(2). *Id*. at 31-32. Defendant argues that "[b]ecause the claim is missing from the [TAC], summary judgment should be rejected." Def. Opp. at 33. Neither party addresses the appropriate standard for determining whether amendment under Fed. R. Civ. P 15(b)(2) is appropriate.

Fed. R. Civ. P. 15(b)(2) provides "[w]hen an issue not raised by the pleadings *is tried* by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2) (emphasis added). When analyzing whether there has been implied consent during a trial, courts look to "whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond." *Addie v. Kjaer,* 737 F.3d 854, 867 (3d Cir.2013) (citation and internal quotations omitted). However, "an issue *has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled*, because the defendant does not have any notice that the implied claim was being tried." *Id.* (emphasis added (citation and internal quotations omitted)). There is a circuit split as to whether Rule 15(b)(2) applies on summary judgment, and the Third Circuit has not yet ruled on this issue. *Posey v. NJR*

---

[10] Plaintiffs also sought summary judgment as to liability on this claim. As discussed below, Plaintiffs' motion to amend under Rule 15(b)(2) is denied and the Court therefore does not reach the issue of summary judgment as to liability under 49 C.F.R. § 376.12(k).

*Clean Energy Ventures Corp.*, No. 14-6833, 2015 WL 6561236, at *2 (D.N.J. Oct. 29, 2015)

(quoting *Liberty Lincoln–Mercury, Inc. v. Ford Motor Co.,* 676 F.3d 318, 327 n. 7 (3d Cir.2012)).

Plaintiffs base their Rule 15(b)(2) argument on "prior pleadings" and whether Defendant

had notice of the claim.  *See* Pl. Reply at 21-22 fn. 10.  Both are irrelevant, based on the plain

language of Rule 15(b)(2), as to whether an amendment is appropriate.  Instead, the inquiry is

whether Plaintiff introduced evidence relevant to a claim under Section 376.12(k) without

objection from Defendant.  The only evidence that Plaintiffs produce to demonstrate that the Lease

violates Section 376.12(k) is the Lease itself,[11] which is relevant to Plaintiffs' original claims.  *See*

*Posey*, 2015 WL 6561236, at *2 ("I need not resolve the question of whether to apply Rule 15(b)

at the summary judgment stage, because the evidence relevant to Plaintiff's new legal theories, the

Lease and associated documents, is also relevant to her original claims."); *see also Kjaer,* 737 F.3d

at 867 ("At trial, any evidence that the Sellers introduced to support a fraudulent inducement claim

would have been highly relevant to their fraudulent misrepresentation claim. Consequently, there

would have been no way for Buyers to be on notice of Sellers' claim of fraudulent inducement.").

And Defendant has explicitly opposed Plaintiffs' attempted amendment through Rule 15(b)(2).

Def. Op. at 33 ("Because the claim is missing from the Complaint, summary judgment should be

rejected.").  The Court denies Plaintiffs' motion to amend under Rule 15(b)(2) and therefore does

---

[11] The other piece of evidence that could potentially support of this claim is a letter dated July 2,
2012 from Defendant's former counsel to Plaintiffs' counsel.  In relevant part, the letter provides:
"In response to your request for the return of Vaudral Luxama's escrow deposit with [Defendant],
enclosed is a check payable to Vaudral Luxama in the amount of the escrow deposit.  While there
is a dispute as to whether the contractual conditions for the return of the deposit were satisfied,
[Defendant] has elected to return the deposit."  D.E. 281-1, Ex. 7 at 1.  This letter only pertains to
Plaintiff Luxama rather than all drivers or even the other named Plaintiffs.  Moreover, such
evidence would only be relevant to the question whether Defendant complied with the terms of
the Lease, not whether the terms of the Lease comply with Section 376.12(k) – only the terms of
the Lease could be relevant to that question.

not reach the issue of whether the Lease complies with Section 376.12(k).

### D.  The Parties' Motions for Summary Judgment as to Injunctive Relief

Both parties move for summary judgment as to Plaintiffs' request for an injunction ordering Defendant to reform the language of the Lease.  Defendant contends that summary judgment is appropriate because Plaintiffs cannot meet the standard for establishing a mandatory injunction and that, in any event, Defendant has employed the New Lease with its drivers since 2017, such that injunctive relief with respect to the Lease is moot.  Def. Br. at 35-37.  Plaintiffs respond that the requirements for an injunction are met, Pl. Br. at 35-40, and that their request is not moot because "there has not been an adjudication that the newly-implemented lease complies with the regulations."  Pl. Opp. at 39.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice"; in other words, it does not moot the case.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal citations omitted).  "If it did, the courts would be compelled to leave the defendant . . . free to return to his old ways."  *Id.* (internal citations omitted).  A court only finds that a case is moot because of a defendant's voluntary conduct when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (citing *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)); *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 283 (N.D. Ill. 2005).  In *Allied Van Lines, Inc.*, the defendant argued that Rule 23(b)(2) class certification was moot because defendant was "currently in the process of implementing a new form of lease that addresses each of the claimed [Truth-in-Leasing] deficiencies."  *Id.*  The Northern District of Illinois found this argument "toothless and wholly unpersuasive."  *Id.*

The Court finds Defendant's mootness argument unpersuasive.  Defendant is still free to return to the old Lease form or otherwise change its current lease.  In addition, there has not been an adjudication that the New Lease complies with the regulations.  Therefore, the Court finds that the alleged violations could reasonably reoccur and does not find injunctive relief moot.

A party seeking a permanent injunction must demonstrate it actually succeeded on the merits and that "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Mylan Inc. v. Smithkline Beecham Corp.*, No. 10-CV-4809, 2014 WL 3519102, at *3 (D.N.J. July 16, 2014) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006)).  *See also Mister Softee, Inc. v. Amanollahi*, No. 214CV01687KMJBC, 2016 WL 5745105, at *8 (D.N.J. Sept. 30, 2016) (stating court must consider whether party seeking injunction "has actually succeeded on the merits." (citing *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)).  Here, Plaintiffs have "actually succeeded" on the merits of their claims under 49 C.F.R. § 376. 12(d), 49 C.F.R. § 376.12(g), and 49 C.F.R. § 376.12(h) by obtaining summary judgment as to their claims.

Courts typically consider the first and second factors together, *Mylan Inc.*, No. 10-CV-4809, 2014 WL 3519102, at *3, because "[a]lthough irreparable injury and inadequacy of legal remedy are not always the same, demonstrating that plaintiff will suffer irreparable injury is a 'common method' of showing there is no adequate legal remedy."  *Id*. (citing *Port Drivers*, 757 F. Supp. 2d at 460).  As to those factors, Plaintiffs argue that the burden of future litigation constitutes irreparable injury.  Specifically, Plaintiff argues that "if Ironbound is not restrained, such violations

will create a continuing cycle of litigation.  Each time Plaintiffs, or a Driver who has not sued here, performs services, a new claim would accrue.  Drivers would then have to file new and separate and repeated claims."  Pl. Br. at 38.  Defendant responds that Plaintiffs cannot show irreparable harm because its New Lease "complies with all regulations."  Def. Opp. at 35-36.  However, there has not been an adjudication that Defendants' New Lease complies with the regulations.  "The burden of future litigation 'might, in and of itself, constitute irreparable harm' because a party should not have to continue to re-litigate issues that have already been decided."  *Port Drivers*, 757 F. Supp. 2d at 460 (quoting *Se. Pennsylvania Transp. Auth. v. Pennsylvania Pub. Util. Comm'n*, 210 F. Supp. 2d 689, 726 (E.D. Pa. 2002), *aff'd sub nom. Nat'l R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n*, 342 F.3d 242 (3d Cir. 2003)).  Plaintiffs' have established Defendant's Lease violated certain of the Regulations.  If Plaintiffs are not granted a permanent injunction, they may be forced to return to court to file claims for relief every time they contract with Defendants or every time Defendants modify their form lease.  *See Port Drivers*, 757 F. Supp. 2d at 460; *see also Mylan Inc*, No. 10-CV-4809, 2014 WL 3519102, at *3 (finding irreparable harm because the plaintiff would "be forced to continuously seek legal action in order to enforce its rights under the License Agreement.").  This would be a waste of judicial resources and would cause Plaintiffs to suffer irreparable harm.  *Mylan Inc*, No. 10-CV-4809, 2014 WL 3519102, at *3.

Concerning the balance of the hardships, Plaintiffs argue that Defendant will suffer no hardship because a permanent injunction will do "nothing more than require [Defendant] . . . comply with the [law]."  Pl. Br. at 39 (citing *Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J.), *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013)).  The Court agrees.  The balance of the hardship weighs in favor of granting an injunction because Defendant will suffer no harm – the only hardship imposed

49

on Defendant is compliance with the Regulations, which it already must do. *Nat'l Collegiate Athletic Ass'n*, 926 F. Supp. 2d at 578; *Port Drivers*, 757 F. Supp. 2d at 461 ("[Defendant] is already required by law to comply with the Regulations; if any injunction is granted, it should suffer no hardship in bringing its leases into conformity with the law.").

The Court also finds that an injunction is in the public interest. The Regulations "seek to prevent large carriers from taking advantage of owner-operators due to uneven bargaining power." *Port Drivers*, 757 F. Supp. 2d at 461 (citing *Swift Transp. Co.*, 367 F.3d at 1110). Defendant is a carrier that has failed to comply with the Regulations and the public interest will be served by ensuring that Defendant complies with the Regulations.

The factors for a permanent injunction have been satisfied. The Court will enjoin Defendant from entering into leases with Plaintiffs containing or lacking language consistent with 49 C.F.R. § 376. 12(d), 49 C.F.R. § 376.12(g), and 49 C.F.R. § 376.12(h). Within 10 days of this Opinion, Plaintiffs shall submit proposed language for the injunction order to the Court.

## IV.    CONCLUSION

For the reasons stated above, and for good cause shown, the parties' motions for summary judgment are granted in part and denied in part. An appropriate Order accompanies this Opinion.

Dated: March 25, 2021

John Michael Vazquez, U.S.D.J.